**12-1011-cv**
*Marcos Poventud v. City of New York, et al.*

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

August Term, 2013

(Argued: September 25, 2013     Decided: January 14, 2014)

Docket No. 12-1011-cv

MARCOS POVENTUD,

*Plaintiff-Appellant*,

-v.-

CITY OF NEW YORK; Robert T. JOHNSON, in his official capacity as District Attorney for Bronx County; Frankie ROSADO, Kenneth UMLAUFT, Christopher DOLAN, and Daniel TOOHEY, individually and as members of the New York City Police Department,

*Defendants-Appellees.*[*]

Before:
 KATZMANN, *Chief Circuit Judge*, JACOBS, CALABRESI, CABRANES, POOLER, SACK, RAGGI, WESLEY, HALL, LIVINGSTON, LYNCH, CHIN, LOHIER, CARNEY, and DRONEY, *Circuit Judges.*[**]

---

[*] The Clerk of the Court is directed to amend the caption as listed above.

[**] Senior Circuit Judges Calabresi and Sack were members of the initial three-judge panel that heard this appeal and are therefore eligible to participate in *en banc* rehearing.  28 U.S.C. § 46(c)(1).

1

WESLEY, *J.* filed the majority opinion in which KATZMANN, *C.J.*, CALABRESI, POOLER, SACK, HALL, LYNCH, LOHIER, and CARNEY, *JJ.*, joined.

LYNCH, *J.* filed a concurring opinion.

LOHIER, *J.* filed a concurring opinion in which CALABRESI, POOLER, WESLEY, HALL, and LYNCH, *JJ.*, joined.

CHIN, *J.* filed an opinion dissenting in part and concurring in part.

JACOBS, *J.* filed a dissenting opinion in which CABRANES, RAGGI, LIVINGSTON, and DRONEY, *JJ.*, joined.

LIVINGSTON, *J.* filed a dissenting opinion in which JACOBS, CABRANES, RAGGI, and DRONEY, *JJ.*, joined.

Appeal from a decision of the United States District Court for the Southern District of New York (Deborah A. Batts, *Judge*) granting summary judgment to defendants and dismissing plaintiff's 42 U.S.C. § 1983 claims as barred by *Heck v. Humphrey*, 512 U.S. 477 (1994). A previously constituted panel of this Court held that the plaintiff could sue under § 1983 because he was no longer in custody and had no access to federal *habeas* relief. *Poventud v. City of New York*, 715 F.3d 57, 62 (2d Cir. 2013). Pursuant to a vote of the active judges of this Court, that opinion is vacated. Following this rehearing *en banc*, and for the reasons discussed herein, the Court holds that *Heck* does not apply to the plaintiff because his claim pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963), does not necessarily imply that his guilty plea is invalid. We need not reach the issue of whether *Heck* applies to plaintiffs who have been released from prison or otherwise do not have access to *habeas*.

VACATED and REMANDED.

JOEL B. RUDIN, Law Offices of Joel B. Rudin, New York, NY (Julia P. Kuan, Romano & Kuan, New York, NY, *on the brief*), *for Plaintiff-Appellant Marcos Poventud*.

MICHAEL B. KIMBERLY, Mayer Brown LLP, Washington, D.C. (Richard D. Willstatter, National Association of Criminal Defense Lawyers, White Plains, NY; Marc Fernich, New York State Association of Criminal Defense Lawyers, New York, NY; Charles A. Rothfeld, Paul W. Hughes, Mayer Brown LLP, Washington, D.C.; *on the brief*), *for Amicus Curiae National and New York State Associations of Criminal Defense Lawyers*.

MORDECAI NEWMAN (Leonard Koerner; Larry A. Sonnenshein; Linda Donahue; Rachel Seligman Weiss; *on the brief*), for Zachary W. Carter, Corporation Counsel of the City of New York, New York, NY, *for Defendants-Appellees City of New York, et al.*

CAITLIN HALLIGAN (Hilary Hassler, Assistant District Attorney, New York County; Steven A. Bender, Assistant District Attorney, Westchester County; Morrie I. Kleinbart, Assistant District Attorney, Richmond County; Itamar J. Yeger, Assistant District Attorney, Rockland County; *on the brief*), for Kathleen M. Rice, President, District Attorneys Association of the State of New York, New York, NY, *for Amicus Curiae District Attorneys Association of the State of New York.*

BARBARA UNDERWOOD, Solicitor General (Richard Dearing, Deputy Solicitor General; Won S. Shin, Assistant Solicitor General; *on the brief*), for Eric T. Schneiderman, Attorney General of the State of New York, New York, NY, *for Amici Curiae States of New York, Connecticut, and Vermont*.

RICHARD C. WESLEY, *Circuit Judge*:

In June 1998, Marcos Poventud was convicted of attempted murder in the second degree and several other related crimes. New York courts upheld Poventud's conviction on appeal. *People v. Poventud*, 300 A.D.2d 223 (1st Dep't 2002), *leave denied*, 1 N.Y.3d 578 (2003). In 2004, Poventud successfully brought a state collateral challenge to his conviction based on *Brady v. Maryland*, 373 U.S. 83 (1963), and *People v. Rosario*, 9 N.Y.2d 286 (1961). His conviction was vacated and a new trial ordered. *People v. Poventud,* 802 N.Y.S.2d 605, 608 (Sup. Ct. Bronx Cnty. 2005). While the State weighed appealing the *Brady* decision, Poventud pled guilty to the lesser charge of attempted robbery in the third degree, pursuant to a plea agreement that dismissed all other charges and stipulated to a one-year sentence (time already served). Upon entry of the plea, Poventud was immediately released. Thereafter, Poventud sued the City of New York and various police officers alleging a violation of his constitutional rights in his 1998 trial.

Poventud's § 1983 claim is centered on the state court determination that he was denied access to evidence in the government's possession that had a reasonable probability of affecting the result of his trial. The district court was of

4

the view that this claim was at odds with Poventud's later plea because, although the withheld evidence supported the alibi Poventud employed at his 1998 trial, his plea colloquy contradicted that defense. As a result, the district court determined that Poventud's § 1983 claims called into question the validity of his 2006 plea and granted summary judgment for the defendants. It based its decision on a long-standing Supreme Court decision, *Heck v. Humphrey*, 512 U.S. 477 (1994), that precludes the use of § 1983 suits for damages that necessarily have the effect of challenging existing state or federal criminal convictions. *Heck* requires that "in order to recover damages for allegedly unconstitutional conviction or imprisonment, or for other harm caused by actions whose unlawfulness would render a conviction or sentence invalid, a § 1983 plaintiff must prove that the [challenged] conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus, 28 U.S.C. § 2254." 512 U.S. at 486-87.

Poventud did exactly what *Heck* required of him. He sought a state court determination that his due process rights were violated in his jury trial, he secured a state court judgment vacating his 1998 conviction, and the State chose

not to appeal. *Heck*, therefore, does not bar Poventud's claims. Accordingly, the district court's summary judgment for defendants is vacated and the case is remanded for further proceedings consistent with this opinion.[1]

## Background

In March 1997, two men robbed livery cab driver Younis Duopo and shot him in the head or neck.[2] An initial search of the cab by Crime Scene Unit ("CSU") detectives uncovered only a spent shell casing, five one dollar bills, and a black hat from the back seat. The day after the shooting, and after CSU searched the vehicle, New York City Police Department ("NYPD") Detective Frankie Rosado reported to the garage and conducted his own search of the cab; this search revealed a wallet on the floor of the cab containing two ID cards that

---

[1] Thus, our decision today has no need to address the question of whether a plaintiff who challenges his allegedly unconstitutional conviction or incarceration, but is no longer in custody and therefore has no access to *habeas*, has recourse to a federal remedy under § 1983.

[2] These facts are drawn from the Second Amended Complaint and the Plaintiff's Response to Defendants' Rule 56.1 Statement and Statement of Additional Facts. Although these facts may be disputed at trial, "[b]ecause this case comes to us on [defendants'] motion for summary judgment, 'the evidence of [Poventud] is to be believed, and all justifiable inferences are to be drawn in [his] favor.'" *Eastman Kodak Co. v. Image Technical Servs., Inc.*, 504 U.S. 451, 456 (1992) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)).

belonged to Poventud's brother, Francisco Poventud.  Sergeant Kenneth Umlauft

prepared a photo array using the ID cards recovered from the cab; he showed

Duopo the array and Duopo unequivocally identified Francisco as his shooter.

The NYPD soon discovered that Francisco had been incarcerated at the time of

the crime and turned to Poventud, who did not resemble the photograph of

Francisco shown to Duopo, as the most likely carrier of Francisco's wallet.[3]

On consecutive days one week after the crime, Rosado and NYPD officer

Daniel Toohey showed Duopo photo arrays containing Poventud's picture;

Duopo did not identify Poventud as the perpetrator on either occasion.  The day

after the second failed identification, NYPD officers showed Duopo Poventud's

picture for a third time.  Later that day, Duopo viewed Poventud's picture for a

fourth time and he identified him as the shooter.  The officers brought Poventud

---

[3] Some of these facts are disputed by the panel's dissenting opinion and in the dissents filed with our opinion today.  *See Poventud v. City of New York*, 715 F.3d 57, 66 (2d Cir. 2013) (Jacobs, *Judge*, dissenting).  At trial the defendants are, of course, free to argue to the jury that their version of these disputed facts is correct – for example, that Duopo wrote that Francisco Poventud "looks like" the shooter, *see id.* at 66 (internal quotation marks omitted); Francisco and Marcos bear a striking resemblance, *see id.* at 67; or the wallet was found "immediately" after the hold-up, Dissenting Op. of Judge Jacobs, *post*, at 3.  As noted above, in an order granting summary judgment, we construe all genuine disputes of material fact in favor of the nonmoving party.  *United States v. Sum of $185,336.07 U.S. Currency Seized from Citizen's Bank Account L7N01967*, 731 F.3d 189, 192 (2d Cir. 2013).

in to take his statement, at which point Duopo identified him in a lineup. Despite NYPD policies forbidding such behavior, the officers neither preserved nor disclosed to the Bronx District Attorney's Office the photo array in which Duopo mistakenly identified Francisco.

Assistant District Attorney ("ADA") Gregg Turkin prosecuted Poventud and codefendant Robert Maldonado, whom Duopo also identified in a lineup. Before trial, Turkin asked Umlauft about some stray photographs in the file; Umlauft explained them away without disclosing that he had completed a separate photo array from which Duopo had identified Francisco as the shooter. Turkin, ignorant of this information, did not disclose it to the defense.

At trial in 1998, Duopo was the only witness to identify Poventud as the shooter. Defense counsel tried to impeach the credibility of Duopo's identification by focusing on the multiple attempts that it took to identify Poventud; these efforts were bolstered by Duopo's two additional mistaken identifications of Maldonado's brother as Poventud's partner in crime. Poventud's defense was that he was not present in the cab; he testified that he was at a neighbor's apartment playing video games instead. He further posited that Duopo was shot by three men who were arrested for another shooting of a

8

livery cab driver, seventeen days after the Duopo shooting, using the same gun used to shoot Duopo. Although Umlauft testified, the defense, still unaware of the victim's misidentifications of Francisco, was unable to question Umlauft or Duopo about them.

The jury submitted requests for more information about Duopo's failures to identify Poventud and a note indicating that it was "hopelessly deadlocked" after four days of deliberations. It convicted both Poventud and Maldonado on the fifth day; Poventud was convicted of attempted murder in the second degree, attempted robbery in the first degree, assault in the first degree, and criminal possession of a weapon in the second degree. The judge sentenced him to an indeterminate sentence of 10 to 20 years' imprisonment.

In 2002, Maldonado's conviction was overturned by the New York Court of Appeals, *People v. Maldonado*, 97 N.Y.2d 522 (2002), while Poventud's conviction was affirmed by the Appellate Division and leave to appeal to the Court of Appeals was denied. *People v. Poventud*, 300 A.D.2d 223 (1st Dep't 2002), *leave denied*, 1 N.Y.3d 578 (2003).[4] During Maldonado's retrial, new ADA Jeremy Shockett learned about Duopo's erroneous identification of Francisco. Shockett

---

[4] Leave was denied by Judge G.B. Smith. *See* N.Y. C.P.L. § 460.20(2).

disclosed this information to defense counsel. Maldonado was acquitted.

Based on the newly revealed information, Poventud moved, pursuant to New York Criminal Procedure Law § 440.10, to vacate his conviction. *People v. Poventud*, 802 N.Y.S.2d 605 (2005). Finding a violation of the disclosure obligations under *Brady v. Maryland*, 373 U.S. 83 (1963), and *People v. Rosario*, 9 N.Y.2d 286 (1961), the court vacated Poventud's conviction in October 2005.

The District Attorney's Office opposed Poventud's release on bail and indicated its desire to appeal the court's § 440.10 decision. Pursuant to an agreement with the prosecution, Poventud pled guilty in January 2006 to attempted robbery in the third degree, a nonviolent class E felony, with a stipulated one-year sentence. He was immediately released.

In May 2007, Poventud initiated this suit, alleging that his 1998 conviction violated his constitutional right to due process. In 2009, he stayed this suit pending a state court challenge to the validity of his guilty plea. Poventud abandoned that collateral attack, however, and refocused on his claim under 42 U.S.C. § 1983.

In 2011, the defendants moved for summary judgment, asserting that *Heck v. Humphrey*, 512 U.S. 477, barred Poventud's constitutional tort claims.

Poventud argued that his plea had nothing to do with his § 1983 claim, which concerned his jury trial conviction that had been vacated as a result of his *Brady* victory. Judge Batts rejected that view and granted the motion, finding that Poventud's § 1983 suit challenged a state court conviction (his plea) which had not been vacated. *Poventud v. City of New York*, No. 07-CV-3998(DAB), 2012 WL 727802, at *3 (S.D.N.Y. Mar. 6, 2012). Judge Batts saw a connection between the undisclosed exculpatory evidence and Poventud's defense at trial. She then concluded that Poventud's alibi was factually inconsistent with his subsequent guilty plea. *Id.*[5] Because of the relationship that she perceived between the misidentification evidence and the erroneous alibi at Poventud's 1998 trial, Judge Batts required that Poventud prove a favorable termination of any charge arising

---

[5] Specifically, Judge Batts wrote:

Plaintiff seeks to avoid the conclusion that his suit calls the validity of his second conviction into question by arguing that his initial conviction was invalidated and that he does not challenge his subsequent conviction by guilty plea. Plaintiff's argument is unavailing. Plaintiff's guilty plea, which resulted in his second conviction and sentence, was to conduct which necessarily required his presence at the scene of the crime. To succeed on a § 1983 claim based on an alleged failure to reveal evidence supporting his claim to have been elsewhere when the crime to which he pleaded guilty occurred would thus call into question the validity of his conviction by guilty plea.

*Poventud*, 2012 WL 727802, at *3.

11

from the criminal transaction that occurred with the shooting and robbery, consistent with the requirements of malicious prosecution claims. *Id.* (citing, *inter alia*, *Smith-Hunter v. Harvey*, 95 N.Y.2d 191, 196-97 (2002)). Because a plea to a lesser-included charge does not meet that requirement, Judge Batts held that *Heck* barred Poventud's claim. *Id.*

Poventud appealed to a panel of this Court in 2012. In April 2013, a divided panel held that *Heck* did not apply to Poventud's lawsuit because he had been released from prison and therefore no longer had access to *habeas corpus* remedies. *Poventud*, 715 F.3d at 60.[6] We ordered this rehearing *en banc*, vacated the panel's opinion,[7] and, for the reasons stated below, find that *Heck* does not bar Poventud's § 1983 suit because his claim does not necessarily imply the invalidity of his outstanding conviction.

---

[6] To be fair, our request for briefing centered on the issue that provided the decisional pivot for the panel majority – the relationship of access to *habeas* relief and the use of § 1983. The result was that some of the briefing goes to a much broader issue than that which we decide today.

[7] In essence, the dissents want to revisit many of the issues that separated the judges on the initial panel. The dissents' continued unease with the earlier opinion is irrelevant to the task at hand. As we note several times in this opinion, we decide this matter on the narrowest possible grounds without passing any judgments on the views previously expressed by either the members of the panel majority, who considered themselves bound by circuit precedent in a way the *en banc* Court is not, or by the then lone dissenter.

**Governing Law**

## I. 42 U.S.C. § 1983, *Heck*, and the Invalidity of Outstanding Convictions

In passing the Ku Klux Klan Act of 1871, 17 Stat. 13, Congress created a cause of action that gave "a remedy to parties deprived of constitutional rights, privileges and immunities by an official's abuse of his position." *Monroe v. Pape*, 365 U.S. 167, 172 (1961), *overruled on other grounds by Monell v. Dep't of Social Servs.*, 436 U.S. 658 (1978). "It was not the unavailability of state remedies but the failure of certain States to enforce the laws with an equal hand that furnished the powerful momentum behind this 'force bill,'" *Monroe*, 365 U.S. at 174-75 (citation omitted), which is now codified at 42 U.S.C. § 1983. This statute provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable. For the purposes of this section, any Act of Congress applicable exclusively to the District of Columbia shall be considered to be a statute of the District of Columbia.

The broad language of § 1983 suggests its applicability to cases involving

13

*any* constitutional deprivation. Indeed, the breadth of § 1983 made it appealing to state prisoners who sought to challenge their confinement as unconstitutional. However, "[t]he Supreme Court, in *Preiser v. Rodriguez*, 411 U.S. 475 (1973), and *Heck v. Humphrey*, 512 U.S. 477 (1994), has effectively subordinated the § 1983 remedy to the writ of *habeas corpus* when the remedies would overlap (and to some extent, even when they do not)." Richard H. Fallon, Jr., John F. Manning, Daniel J. Meltzer & David L. Shapiro, *Hart & Wechsler's The Federal Courts & The Federal System* 966 (6th ed. 2009).

In *Preiser*, the Supreme Court denied a cause of action under § 1983 for state prisoners challenging their deprivation of good-conduct-time credits pursuant to state administrative procedures and seeking "a determination that [they were] entitled to immediate release or a speedier release from [state] imprisonment." 411 U.S. at 500. Because the prisoners were "challenging the very fact or duration of [their] physical imprisonment," *id.*, which the Court described as "the traditional function of the writ [of *habeas corpus*]," *id.* at 484, the Court held that *habeas corpus* provided the sole vehicle to seek this relief, *id* at 500. The prisoners conceded "that a state prisoner challenging his underlying conviction and sentence on federal constitutional grounds in a federal court is

14

limited to habeas corpus," and the Court declined to recognize a distinction where the challenge was to a final administrative decision. *Id.* at 489.

The year after *Preiser* was decided, the Supreme Court addressed a due process claim in which prisoners alleged that a prison's procedures for deprivation of good time credits were constitutionally defective and sought restoration of the credits, institution of a new plan by prison officials, and "damages for the deprivation of civil rights resulting from the use of the allegedly unconstitutional procedures." *Wolff v. McDonnell*, 418 U.S. 539, 553 (1974). The Court held that *Preiser* foreclosed the complaint's quest for "restoration of good-time credits." *Id.* at 554. However, "*Preiser* expressly contemplated that claims properly brought under § 1983 could go forward while actual restoration of good-time credits is sought in state proceedings. [The prisoners'] damages claim was therefore properly before the District Court and required determination of the validity of the procedures employed for imposing sanctions, including loss of good time . . . ." *Id.* (citation omitted).

In *Heck*, the Court noted the distinction between the fate of the prisoners' plea for good-time credits and for damages arising from claims of administrative process that ran afoul of due process. 512 U.S. at 482. Critically, the Court read

15

*Wolff* to permit prisoners to bring "a § 1983 claim for using the wrong procedures, not for reaching the wrong result." *Id.* at 482-83. Recognizing that a due process claim could morph into a "wrong result" claim, the Court was careful to note that the damages for the use of the wrong procedures did not need to be "measured by the actual loss of good time." *Id.* at 482. "Thus, the claim at issue in *Wolff* did *not* call into question the lawfulness of the plaintiff's continuing confinement." *Id.* at 483 (emphasis in original).[8]

Roy Heck was convicted of voluntary manslaughter for killing his wife. 512 U.S. at 478. While his direct appeal of his conviction was pending in state court,[9] Heck brought a § 1983 suit alleging that Indiana police and investigators had "knowingly destroyed evidence which was exculpatory in nature and could have proved [his] innocence," *id.* at 479 (internal quotation marks omitted). Heck's § 1983 suit "sought, among other things, compensatory and punitive

---

[8] A later decision clarified that even suits alleging the use of improper procedures would be barred where "the nature of the challenge to the procedures could be such as necessarily to imply the invalidity of the judgment." *Edwards v. Balisok*, 520 U.S. 641, 645 (1997).

[9] The Indiana Supreme Court upheld *Heck*'s conviction while his § 1983 case was pending before the Seventh Circuit. *Id.* at 479.

monetary damages," but not release.[10]  *Id.*  Heck sought reimbursement for the

violation of his constitutional rights based on his allegedly unlawful confinement.

The trouble was that Heck was still in prison pursuant to his judgment of

conviction as he pursued his suit.

Rejecting proposals for an exhaustion requirement, the *Heck* Court

explicitly held that damages actions could be brought by state prisoners before

exhausting all state remedies; however, it noted that this proposition "may not be

true . . . when establishing the basis for the damages claim necessarily

demonstrates the invalidity of the conviction.  In that situation, the claimant can

be said to be 'attacking the fact or length of confinement,'" which is

impermissible.  512 U.S. at 481-82 (quoting *Preiser*, 411 U.S. at 490) (emphasis and

alterations omitted).  "[I]n order to recover damages for allegedly

unconstitutional conviction or imprisonment, or for other harm caused by actions

whose unlawfulness would render a conviction or sentence invalid, a § 1983

plaintiff must prove that the conviction or sentence has been reversed on direct

_____

[10] Heck's two attempts at securing *habeas* relief had come up short: "his first petition for a writ of habeas corpus in Federal District Court was dismissed because it contained unexhausted claims; and his second federal habeas petition was denied, and the denial affirmed by the Seventh Circuit." *Id.* at 479.

17

appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus, 28 U.S.C. § 2254." *Id.* at 486-87. As Heck's civil claim relied on his innocence and challenged the validity of the conviction that secured his incarceration, it met none of these criteria; he had no cause of action under § 1983.

In its analysis, the Court relied on an analogy to the common law tort of malicious prosecution "because, unlike the related cause of action for false arrest or imprisonment, it permits damages for confinement imposed pursuant to legal process." *Heck*, 512 U.S. at 484. The Court focused on the favorable termination requirement, an "element that must be alleged and proved in a malicious prosecution action." *Id.* The benefit of this rule is that it "'avoids parallel litigation over the issues of probable cause and guilt and it precludes the possibility of the claimant['s] succeeding in the tort action after having been convicted in the underlying criminal prosecution, in contravention of a strong judicial policy against the creation of two conflicting resolutions arising out of the same or identical transaction.'" *Id.* (quoting 8 S. Speiser, C. Krause, & A. Gans, *American Law of Torts* § 28:5, at 24 (1991)) (alteration omitted). To preserve

18

"finality and consistency," *id.* at 485, the Court applied "the hoary principle that civil tort actions are not appropriate vehicles for challenging the validity of outstanding criminal judgments . . . to § 1983 damages actions that necessarily require the plaintiff to prove the unlawfulness of his conviction or confinement, just as it has always applied to actions for malicious prosecution," *id.* at 486.

The analogy to malicious prosecution continues throughout *Heck*. The Court held that "[j]ust as a cause of action for malicious prosecution does not accrue until the criminal proceedings have terminated in the plaintiff's favor, so also a § 1983 cause of action for damages attributable to an unconstitutional conviction or sentence does not accrue until the conviction or sentence has been invalidated." *Id.* at 489-90 (internal citations omitted). However, the opinion stops short of holding that malicious prosecution's favorable termination requirement, as applied at the common law, governs all § 1983 suits -- and for good reason. The *Heck* Court dealt only with Heck's claim and its interaction with the available writ of *habeas corpus*. There was no reason for the Court to attempt to divine every possible permutation of constitutional tort related to criminal proceedings that might find its way into federal courtrooms as a § 1983 claim. The only issue in *Heck* was whether a § 1983 claim could be brought when

19

that claim suggested the invalidity of an existing state court conviction.

## II. Malicious Prosecution Suits and Favorable Termination

Malicious prosecution suits require, as an element of the offense, "'the termination of the proceeding in favor of the accused.'" *Smith-Hunter*, 95 N.Y.2d 191, 195 (2002) (quoting *Broughton v. State of New York*, 37 N.Y.2d 451, 457 (1975)).[11] "[U]nder the common law any final termination of a criminal proceeding in favor of the accused, such that the proceeding cannot be brought again, qualifies as a favorable termination for purposes of a malicious prosecution action." *Smith-Hunter*, 95 N.Y.2d at 195. (citations omitted). "A termination is not favorable to the accused, [however], if the charge is withdrawn or the prosecution abandoned pursuant to a compromise with the accused. Indeed, it is hornbook law that 'where charges are withdrawn or the prosecution is terminated by reason of a compromise into which the accused has entered voluntarily, there is no sufficient termination in favor of the accused.'" *Id.* at 196-

---

[11] "'Over the centuries the common law of torts has developed a set of rules to implement the principle that a person should be compensated fairly for injuries caused by the violation of his legal rights. These rules, defining the elements of damages and the prerequisites for their recovery, provide the appropriate starting point for the inquiry under § 1983 as well.'" *Heck*, 512 U.S. at 483 (quoting *Carey v. Piphus*, 435 U.S. 247, 257-58 (1978)) (alteration omitted). "Thus, to determine whether there is any bar to the present suit, we look first to the common law of torts." *Heck*, 512 U.S. at 483.

97 (quoting Prosser and Keeton, *Torts* § 119, at 875 (5th ed. 1984)) (alterations omitted); *see also Restatement (Second) of Torts* § 660(d) (1977).

In the context of § 1983 malicious prosecution cases, *Heck*'s bar is coextensive with the favorable termination requirement. *See, e.g.*, *McNeill v. People of City and State of N.Y.*, No. 06-CV-4843(NGG), 2006 WL 3050867, at *2-3 (E.D.N.Y. Oct. 24, 2006), *aff'd by summary order*, 242 F. App'x 777 (2d Cir. 2007); *Papeskov v. Brown*, No. 97-CV-5351(SS), 1998 WL 299892, at *5 (S.D.N.Y. June 8, 1998), *aff'd*, 173 F.3d 845 (table) (2d Cir. 1999). In these cases, as in state malicious prosecution cases, the tort cannot stand unless the underlying criminal cases "'finally end[] in failure.'" *DiBlasio v. City of New York*, 102 F.3d 654, 657 (2d Cir. 1996) (quoting *Burt v. Smith*, 181 N.Y. 1, 5 (1905)) (emphasis omitted). "It is not surprising, therefore, that several United States Courts of Appeals have cited [*Heck v.*] *Humphrey* as authority for the proposition that § 1983 claims for malicious prosecution do not accrue until their respective criminal prosecutions end in acquittal." *Id.* at 658.

In *DiBlasio* – rightly decided and unaffected by our holding today – a panel of this Court addressed Mario DiBlasio's claim of malicious prosecution. DiBlasio, convicted following a jury trial of criminal sale of cocaine and related

21

charges, secured *vacatur* of his conviction through a *habeas* suit brought in the Eastern District of New York that alleged that the state failed to produce or identify a confidential informant. *Id.* at 655. On retrial, DiBlasio was convicted of only one of the lesser included offenses. *Id.* He then sued under § 1983, "alleging malicious prosecution by the police officers." *Id.* He contended that his conviction of a lesser offense was a favorable result that entitled him to damages for malicious prosecution on the more serious crimes. The district court dismissed and we affirmed. *Id.* at 656, 659.

DiBlasio was successful in challenging his initial conviction, seemingly in compliance with *Heck*'s mandate. He was retried and convicted, but only for a lesser offense. DiBlasio contended that this was a favorable result as required by *Heck*. Because DiBlasio's claim was for malicious prosecution, the panel disagreed. "Although in some instances a habeas court may terminate a criminal proceeding in the defendant's favor, the reversal of a conviction and remand for a new trial does not constitute such a termination." *DiBlasio*, 102 F.3d at 658. The Court, applying the malicious prosecution standard, "h[e]ld that the criminal proceeding terminated when DiBlasio was convicted on the retrial. The writ could not be considered an 'indication of innocence' since DiBlasio conceded

both the possession and sale of the cocaine." *Id.* The fact that the ultimate

conviction was on a lesser count was irrelevant, because the charges arising out

of the criminal transaction had to be brought together and as a whole "[t]he

State's case did not end in failure or in DiBlasio's favor." *Id.* at 659. DiBlasio's

§ 1983 malicious prosecution claim was thus properly *Heck*-barred (despite the

fact that his initial conviction was vacated) because malicious prosecution under

New York law requires "favorable termination of the proceedings" and a valid

conviction on the lesser crime prevented the court from finding a "favorable

termination." Either the outstanding conviction was invalid, or the elements of

malicious prosecution were not met; *DiBlasio* is precisely the sort of case in which

"a judgment in favor of the plaintiff would necessarily imply the invalidity of his

conviction." *Heck*, 512 U.S. at 487.

Not every § 1983 claim that arises out of a criminal case requires that the

underlying criminal process reach a favorable termination. "Contrary to the

district court's view in this case, *Heck* does not automatically bar a § 1983 claim

simply because the processes of the criminal justice system did not end up in the

plaintiff's favor. A plaintiff need not prove that *any* conviction stemming from an

incident with the police has been invalidated, only a conviction that could not be

23

reconciled with the claims of his civil action." *VanGilder v. Baker*, 435 F.3d 689, 692 (7th Cir. 2006) (emphasis retained, internal quotation marks and alterations omitted); *cf. Jackson v. Suffolk Cnty. Homicide Bureau*, 135 F.3d 254, 257 (2d Cir. 1998) ("[A] claim for use of excessive force lacks the requisite relationship to the conviction. . . . [A] finding that excessive force had in fact been used would not necessarily require the invalidation of the conviction.").

Unlike malicious prosecutions, many violations of constitutional rights, even during the criminal process, may be remedied without impugning the validity of a conviction. For example, when a suspect sues his arresting officer for excessive force, a § 1983 suit may proceed even if the suspect is ultimately convicted of resisting arrest. *VanGilder*, 435 F.3d at 692. When a plaintiff is unlawfully arrested without probable cause, his § 1983 claim accrues before any conviction. *Wallace v. Kato*, 549 U.S. 384, 397 (2007); *see also Morris v. Noe*, 672 F.3d 1185, 1193-94 n.2 (10th Cir. 2012). Even *Heck* acknowledges that many unreasonable searches could lead to § 1983 actions that exist independent of the termination of the criminal proceedings. *Heck*, 512 U.S. at 487 n.7; *see also Gibson v. Superintendent of N.J. Dep't of Law & Pub. Safety-Div. of State Police*, 411 F.3d 427, 448 (3d Cir. 2005), *overruled on other grounds by Dique v. N.J. State Police*, 603 F.3d

24

181, 188 (3d Cir. 2010).

## III. Other § 1983 Claims, Including *Brady* Claims

This Court has emphatically and properly confirmed that *Brady*-based § 1983 claims necessarily imply the invalidity of the challenged conviction in the trial (or plea) *in which the Brady violation occurred.*[12]  *Amaker v. Weiner*, 179 F.3d 48, 51-52 (2d Cir. 1999).  That should come as no surprise; the remedy for a *Brady* violation is *vacatur* of the judgment of conviction and a new trial in which the defendant now has the *Brady* material available to her.

"'There are three components of a true *Brady* violation: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued.'" *United States v. Rivas*, 377 F.3d 195, 199 (2d Cir. 2004) (quoting *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999)).  To establish prejudice, a plaintiff must show materiality:

> 'A showing of materiality does not require demonstration by a preponderance that disclosure of the suppressed evidence would have

---

[12] We reject out of hand defendants' contention that *Brady* violations cannot provide a basis for a § 1983 claim.  *See, e.g., Haley v. City of Boston*, 657 F.3d 39, 52 (1st Cir. 2011); *Beck v. City of Muskogee Police Dep't*, 195 F.3d 553, 560 (10th Cir. 1999); *Walker v. City of New York*, 974 F.2d 293, 300 (2d Cir. 1992).

25

resulted ultimately in the defendant's acquittal (whether based on the presence of reasonable doubt or acceptance of an explanation for the crime that does not inculpate the defendant). The touchstone of materiality is a reasonable probability of a different result, and the adjective is important. The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but *whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence.'*

*Leka v. Portuondo*, 257 F.3d 89, 104 (2d Cir. 2001) (quoting *Kyles v. Whitley*, 514 U.S. 419, 434 (1995)) (alterations omitted, emphasis added).[13] "While *Brady* ensures a fair trial, a defendant's right to pre-trial disclosure under *Brady* is not conditioned on his ability to demonstrate that he *would* or even *probably would* prevail at trial if the evidence were disclosed," much less that he is in fact innocent. *Osborne v. Dist. Att'y's Office for Third Jud. Dist.*, 521 F.3d 1118, 1132 (9th Cir. 2008), *rev'd on other grounds*, 557 U.S. 52 (2009). The remedy for a *Brady* claim is therefore a new trial, as proof of the constitutional violation need not be at odds with his guilt. *See*, *e.g.*, *United States v. Sipe*, 388 F.3d 471, 493 (5th Cir. 2004).

This Court's seminal *Brady / Heck* case was brought *pro se* by Anthony Amaker, who had been convicted of second degree murder in Brooklyn in 1989.

---

[13] Of course, when a defendant is not proven guilty beyond a reasonable doubt, the only verdict "worthy of confidence" is an acquittal, regardless of the defendant's actual guilt.

*See People v. Amaker*, 195 A.D.2d 605, 605 (2d Dep't 1993). The Appellate Division affirmed his conviction, rejecting his ineffective assistance of counsel claim, *id.*; leave to appeal was denied by the Court of Appeals. *People v. Amaker*, 82 N.Y.2d 804 (1993) (table decision). While incarcerated pursuant to his conviction, Amaker brought a § 1983 suit alleging a conspiracy by "police, prosecutors, [his] defense attorneys, the trial judge, an eyewitness, and various court personnel . . . to secure [his] conviction . . . by manufacturing inculpatory evidence and subsequently suppressing evidence probative of their misconduct." *Amaker v. Weiner*, 179 F.3d at 49. This Court appropriately rejected the argument that *Heck* was not triggered by Amaker's "claim that his right to meaningful court access ha[d] been denied by the withholding of exculpatory evidence." *Id.* at 51. "In substance . . . this claim sounds under *Brady v. Maryland*, and therefore does indeed call into question the validity of his conviction. Accordingly, it is barred by *Heck*." *Id.* (citation omitted). Success on Amaker's claim would mean that his conviction, which was not only still on the books but which actually provided the basis for his ongoing incarceration, was the product of a *Brady* violation (and a massive cover-up). *Id.*

But *Heck* does not present the same bar to § 1983 suits where the

underlying conviction has already been expunged; the conviction is no longer

"outstanding." *See, e.g.*, *Moldowan v. City of Warren*, 578 F.3d 351, 376-77 (6th Cir.

2009).[14]  Even when a defendant is retried, a § 1983 suit concerning the earlier

trial could not impeach the new trial's result.  *Smith v. Gonzalez*, 222 F.3d 1220,

1222 (10th Cir. 2000).  A court "invalidate[s] the final judgment in [a] state

criminal trial when [it] vacate[s] [a] conviction."  *Id.*  From that moment on, a

§ 1983 suit would not demonstrate the invalidity of the vacated conviction.  *Id.*  It

also would not impugn a retrial, which on its face could not replicate the

constitutional violations at issue (since the defendant must, by definition, have

been made aware of the *Brady* material before *vacatur*).  *Id.*

Herein lies the district court's error.  The district court treated Poventud's

case as though it were a malicious prosecution claim.[15]  It measured his

---

[14] Judge Livingston ignores this distinction in arguing that *Skinner v. Switzer*, 131 S. Ct. 1289, 1300 (2011), comprises a general prohibition on *Brady*-based § 1983 claims. Dissenting Op. of Judge Livingston, *post*, at 1.  *Skinner*, citing *Amaker*, notes that prisoners bringing *Brady* claims "seek a judgment qualifying them for immediate or speedier release from imprisonment," and that such claims are "within the traditional core of habeas corpus."  *Skinner*, 131 S. Ct. at 1300 (internal quotation marks omitted). Since Poventud, who is no longer incarcerated and has already won post-conviction relief, does not seek release from imprisonment, the language that Judge Livingston excerpts from *Skinner* is misleading and irrelevant to the issue now before us.

[15] This is also the underlying premise of the dissents.

admission in the subsequent plea agreement against his claims in his *Brady* submission. Because his 2006 plea was at odds with his alibi defense at his 1998 trial, Judge Batts concluded that his recovery for a *Brady* claim would call his plea into question. That view misunderstands *Brady* and its correlation to § 1983 claims asserting only violations of the right to due process. The district court's view incorrectly presumes that, on the facts of this case, the State could violate Poventud's *Brady* rights only if Poventud is an innocent man. This last restriction has no basis in the *Brady* case law; materiality does not depend on factual innocence, but rather what would have been proven absent the violation. "[T]he scope of a defendant's [*Brady*-based] constitutional right[ ]is ultimately defined retrospectively, *by reference to the likely effect that the suppression of particular evidence had on the outcome of the trial.*" *United States v. Coppa*, 267 F.3d 132, 140 (2d Cir. 2001) (emphasis added) (citing *Strickler*, 527 U.S. at 281).[16] In this case,

---

[16] Of course, there is a distinction between a victory at trial premised on the State's failure to prove one's guilt and a victory premised on the court's misapprehension of the law. The dissents do not recognize this difference and therefore misunderstand *Lockhart v. Fretwell*, 506 U.S. 364 (1993), in which the Court assumed that counsel's failure to object based on then-prevailing but later-overturned circuit law was deficient and evaluated whether the defendant suffered prejudice with an awareness of the later-established legal standard. Failure to take advantage of the district court's likely application of the circuit court's misapprehension of the law was not prejudicial because a defendant has no right to benefit from a court's erroneous view of the law.

Poventud has the right to argue to the jury that, with the main State witness impeached, he would have been acquitted based on reasonable doubt or convicted on a lesser charge.[17]

We find the First Circuit's decision in *Olsen v. Correiro* analogous and instructive. 189 F.3d 52, 55 (1st Cir. 1999). Olsen, convicted in 1986 of first degree murder, secured *vacatur* (based on the investigating officers' failure to disclose impeachment evidence) and in 1992 pled *nolo contendere* to the lesser charge of

---

However, neither is the State entitled to sustain a conviction predicated on something less than proof beyond a reasonable doubt. No defendant has the right to benefit from a mistake of law; every defendant – even a guilty one – has the right to benefit from the State's heavy burden at a criminal trial.

[17] The dissents ignore the important fact that Poventud's guilty plea in 2006 was not to the same charges for which he was originally convicted and sentenced to prison. Judge Livingston's reprisal of Judge Jacob's lengthy dissent, in particular, ignores that Poventud was lawfully convicted only of a class E felony and sentenced to one year's imprisonment. Dissenting Op. of Judge Livingston, *post*, at 16-17. Guilt of a lesser crime is not inconsistent with the existence of reasonable doubt at an earlier trial for a more serious crime. Poventud's later plea does confirm some criminal liability for the acts that occurred in Duopo's cab, but it does not reaffirm that he would indisputably have been found guilty of attempted murder and sentenced to at least nine years' imprisonment at his 1998 trial.

Judge Livingston's dissent also reveals an inability or unwillingness to distinguish between an argument that Poventud is innocent and an argument that the State did not carry its burden of proving him guilty beyond a reasonable doubt. This is why she argues that Poventud's later-established presence at the scene of the crime precludes him from alleging that the State did not prove him guilty beyond a reasonable doubt. Dissenting Op. of Judge Livingston, *post*, at 2-3.

manslaughter, with the State's agreement to recommend time served. *Id*. He was sentenced to time served and released; he then sued under § 1983 "for damages arising from the murder charge and conviction." *Id.* He was awarded $1.5 million in compensatory damages based on his incarceration; that verdict was overturned by the district court pursuant to *Heck.* A second trial resulted in a verdict again in his favor, but this time with a damages award of only $6,000.

The First Circuit upheld the district court's decisions. To permit Olsen to collect a considerable sum in "incarceration-based damages" would have impugned the validity of his later manslaughter conviction, as Olsen did not serve a day in prison over his lawful sentence for manslaughter, despite his initial murder conviction. *Id.* at 55, 69. However, the court did not disturb that portion of the jury's award that was based on "evidence of other damages associated with his murder trial and conviction." *Id.* at 55. The question of damages was left for the jury, which was free to award damages so long as it confined its consideration to the harms that flowed from the *Brady* violation and not to the imprisonment attributable to his lawful conviction for manslaughter. *Id.*

In other contexts, this Court has recognized procedural claims under

31

§ 1983 even when the denial of due process did not result in concrete injury.

*Brody v. Village of Port Chester*, 345 F.3d 103, 121 (2d Cir. 2003) (Sotomayor, *Judge*) ("[Plaintiff] still may be entitled to declaratory relief and nominal damages in the event a procedural due process violation is proven, even if the district court does not find that [he] . . . would have prevailed" in the challenged proceeding).[18] "Because the right to procedural due process is 'absolute' in the sense that it does not depend upon the merits of a claimant's substantive assertions, and because of the importance to organized society that procedural due process be observed, we believe that the denial of procedural due process should be actionable for nominal damages without proof of actual injury." *Carey v. Piphus*, 435 U.S. 247, 266 (1978) (internal citations omitted). The Supreme Court has recognized the availability of § 1983 actions for "damages for the deprivation of civil rights resulting from the use of the allegedly unconstitutional procedures." *Wolff,* 418 U.S. at 553. It is for the district court and the jury to determine "to what

---

[18] We should not be understood to imply that Poventud is entitled *only* to nominal damages. As we explain below, the principal thrust of our comments regarding nominal damages is that in light of their availability here, we need not consider at this stage of the proceedings whether any of Poventud's incarceration-based damages are *Heck*-barred. This is a matter for the district court to decide in the first instance.

32

damages, if any, [such a plaintiff] is entitled." *Brody v. Village of Port Chester*, 434

F.3d 121, 132 n.8 (2d Cir. 2005).

## IV. Poventud's § 1983 *Brady* Claim Is Consistent with his Guilty Plea

Several of the foregoing principles circumscribe Poventud's *Brady*-based

§ 1983 claim. First, his claim must relate to his 1998 conviction and not to the

2006 conviction.[19] *Amaker*, 179 F.3d at 52. Second, had Poventud's complaint

sounded in malicious prosecution, rather than in a procedural *Brady*-based claim,

that claim would have been barred because of the favorable termination element

of the malicious prosecution tort. *DiBlasio*, 102 F.3d at 657. Finally, Poventud

cannot seek to collect damages for the time that he served pursuant to his plea

agreement (that is, for the year-long term of imprisonment). *Olsen*, 189 F.3d at 55.

With these limitations in mind, we find that Poventud has stated a § 1983 claim.

On its face, Poventud's complaint alleges deficiencies in his 1998 trial that

are entirely independent of the proceedings related to his 2006 plea. *See* Second

---

[19] Nothing in this analysis weighs on whether or not Poventud is precluded from challenging the validity of his 2006 conviction in a separate § 1983 action. A *Brady* claim cannot challenge a conviction obtained *after* disclosure of the *Brady* material; Poventud's claim therefore relates only to his 1998 conviction. Having decided the case on the narrower ground, we do not reach the broader issue on which the panel rested its decision. *Poventud*, 715 F.3d at 60.

Amended Complaint at ¶¶ 1, 115-39.  The complaint alleges that the defendants

"caused [his] unconstitutional conviction and subsequent imprisonment by

deliberately suppressing exculpatory evidence, known as '*Brady* material,' and

also lying to and misleading prosecutors."  *Id.* ¶ 2.  Because Poventud was aware

of the undisclosed exculpatory material prior to his guilty plea, his plea could not

have implicated the constitutional violations at issue in his trial.  Following

*vacatur* of his conviction, a favorable judgment in this § 1983 action would not

render invalid any subsequent, plea-based judgment against Poventud.  *Cf.*

*Smith*, 222 F.3d at 1222.  *Amaker* (like *Heck*, essentially a *Brady* case) ensures that

*Heck*'s bar prevents Poventud from alleging a *Brady* violation with regard to any

valid conviction; however, unlike Amaker's, Poventud's complaint does not

challenge the conviction pursuant to which the State continues to view him a

felon.  The 2006 conviction is a "clean" conviction, untainted by the *Brady*

violation associated with the 1998 conviction.  Just as Poventud's 1998 conviction

is expunged for future sentencing purposes, so, too, is it expunged for this § 1983

action.

Second, Poventud's complaint states claims entirely distinct from malicious

prosecution.  The complaint never mentions malicious prosecution, does not

34

allege most of the elements of malicious prosecution (including favorable termination), and focuses heavily on the defendants' failure to adhere to their disclosure obligations. *See* Second Amended Complaint. Unlike DiBlasio's malicious prosecution claim, Poventud's *Brady* claim is compatible with the validity of his subsequent conviction.[20]

Poventud's complaint seeks damages for his time in prison, but excludes the time that he served pursuant to his unchallenged 2006 guilty plea. *See* Second Amended Complaint ¶ 1. We need not decide what damages might be available for Poventud, but we note that the Supreme Court has "recognized a § 1983 claim for using the wrong procedures," even where a plaintiff could not collect for the court's "reaching the wrong result." *Heck*, 512 U.S. at 482-83. Although under some circumstances, even a "challenge to the procedures could be such as necessarily to imply the invalidity of the judgment," *Edwards v. Balisok*, 520 U.S.

---

[20] Assuming *arguendo* that Poventud's claims did sound in malicious prosecution, these claims would be barred. *DiBlasio*, 102 F.3d at 659. Specifically, claims that undisclosed evidence included "evidence of innocence," Second Amended Complaint ¶ 128, do suggest a malicious prosecution claim. However, while Heck's complaint alleged destruction of "evidence which was exculpatory in nature and could have proved [his] innocence," *Heck*, 512 U.S. at 479 (quotation marks omitted), Poventud's complaint is less concerned with his innocence and instead focuses on "evidence that an identifying witness was unreliable, and evidence impeaching the credibility of significant prosecution witnesses." Second Amended Complaint ¶ 128.

641, 645 (1997), this logic applies only when the procedures resulted in a judgment that has not been impugned. Moreover, "the denial of procedural due process should be actionable for nominal damages without proof of actual injury." *Carey*, 435 U.S. at 266. The extent of Poventud's damages stemming from the *Brady* violation that do not call into question the validity of his 2006 guilty plea is a fact-specific question that should be addressed first by the district court.[21] However, the existence of a cause of action is clear.

Poventud's allocution acknowledged his presence at the scene of the crime, which was inconsistent with his alibi defense at trial. However, this does not defeat the viability of his *Brady* claim. As explained above, *Brady* does not require actual innocence, and even "'[a] guilty man is entitled to a fair trial.'" *People v. Buchalter*, 289 N.Y. 181, 225 (1942) (Lehman, *Chief Judge*, concurring). In

---

[21] The dissents' treatment of causation will startle those who regularly toil in the world of tort law. The Restatement Third (which expressly says it will call proximate cause "scope of liability") is quite clear on the matter: "Duty is a question of law for the court, see § 7, while scope of liability, although very much an evaluative matter, is treated as a question of fact for the factfinder." RESTATEMENT (THIRD) OF TORTS: PHYS. & EMOT. HARM § 29 (2010). Ultimately, the problem here, as in much of the dissents, is the dissents' confusion between factors that may be appropriate – and even winning – defenses to Poventud's § 1983 claims, and factors that instead would lead to the dismissal of the whole § 1983 action *ab initio* for violating the doctrine of *Heck v. Humphrey*.

*Brady*, the Court held that Maryland violated the defendant's constitutional rights by withholding evidence relevant to his sentencing, despite the fact "that nothing in the suppressed confession could have reduced the appellant Brady's offense below murder in the first degree" or related to his guilt or innocence. 373 U.S. at 90 (internal quotation marks omitted).

*Heck* requires that "a § 1983 plaintiff must prove that the conviction or sentence has been . . . declared invalid by a state tribunal authorized to make such determination," *inter alia*. 512 U.S. at 486-87. In this case, Poventud's challenged conviction has been. *People v. Poventud*, 802 N.Y.S.2d at 608. *Heck*'s core concern of finality would not be undercut by Poventud's success at trial; Poventud's claim is premised on an unchallenged finding made in state court.[22]

Were Poventud to win at trial – far from a foregone conclusion – the legal status of his 2006 guilty plea would remain preserved. No element of his § 1983 *Brady* claim requires Poventud to prove his absence from the scene of the crime; if

---

[22] As things stand in the New York courts, (1) Poventud successfully proved a *Brady* violation in his first trial, which the State elected not to appeal; and (2) Poventud pled guilty to attempted robbery in the third degree. We believe these two judgments are logically consistent, and it is not clear why a third judgment, reaffirming the existence of a *Brady* violation at the first trial, would suddenly impugn the second conviction in a way that the outstanding judgment based on the same conviction does not.

it did, his claim would be *Heck*-barred. Poventud's success at trial would mean only that his 1998 conviction was the product of a constitutional violation; in this case, a New York State court has *already* reached this determination and vacated the conviction as a result. *See id.*

**Conclusion**

Poventud's claim is one of process. He asserts that members of the New York City Police Department willfully withheld exculpatory evidence that called into question the testimony of the only witness to place him at the scene of the crime. Poventud's claims are not the stuff of prison idleness or self-absorption; he has proven his claims in state court and the State elected not to appeal his victory. Poventud's conviction was vacated because it rested on a constitutional infirmity. Armed with the information previously denied him, Poventud accepted an offer from the State to plead to a lesser offense. He now seeks to recover from those who violated his right to a fair trial. He does not contest the legitimacy of his plea (nor could he). His claim is restricted to the acts of the police officers before and during his trial in 1998. Poventud's victory in state court, securing *vacatur* of his jury trial conviction, gave life to his claim and

38

separated it from the criminal activity that took place in the Bronx on March 6, 1997. Had Poventud claimed that the entire criminal process was one borne of malice, then our decision would be different. But his claims are circumscribed to the misdeeds of the police prior to his jury trial, and nothing more.

Judgment is VACATED and the case REMANDED to the district court for further proceedings consistent with this opinion.

GERARD E. LYNCH, Circuit Judge, concurring:

I fully join in Judge Wesley's thorough opinion for the Court. I write separately to explain in simple terms why the Court's decision is consistent not only with governing law, but also with the basic assumptions of our jurisprudence.

The question before the Court is whether the rule of Heck v. Humphrey, 512 U.S. 477, 486-87 (1994), which prohibits a criminal defendant from obtaining damages for wrongful prosecution, conviction or imprisonment until and unless the conviction he complains of has been overturned, prevents the plaintiff Marcos Poventud from suing the defendants for, as he alleges, obtaining a conviction against him that led to his incarceration for almost nine years by deliberately suppressing evidence that cast doubt on the critical identification testimony of the victim.[1] The short answer is that it does not, because the criminal judgment against him *was* later vacated by the state court that entered it,

---

[1] Because this is an appeal from a grant of summary judgment dismissing Poventud's civil complaint, the evidence must be construed in the light most favorable to him drawing all reasonable inferences, and resolving all ambiguities in his favor. Colavito v. N.Y. Organ Donor Network, 438 F.3d 214, 217 (2d Cir. 2006). In this case, that is not simply a legal requirement; the findings of the state court on Poventud's post-conviction motion to vacate his conviction provide a strong reason to believe that these allegations are in fact true. When all of the evidence is heard at a civil trial, of course, a jury may or may not agree with Poventud's view of the evidence.

1

because the court found that the police had indeed rendered his trial unfair by suppressing exculpatory evidence. The defendants argue, however, that we should nevertheless forbid Poventud from seeking damages for that wrongful conviction and sentence, because Poventud later, after the full facts were known to both sides, pled guilty to a related but lesser offense, and was sentenced to *one* year of imprisonment.

I

The fundamental complicating fact about this case is that Marcos Poventud has been the subject of *two* efforts to adjudicate the charges against him, with conflicting results. First, he was tried and convicted of extremely serious crimes, including attempted murder, stemming from the robbery of a cabdriver named Younis Duopo, and sentenced to ten to twenty years of imprisonment.[2] It is that conviction that Poventud contends, and that the state court found, was profoundly unfair.

The principal evidence against Poventud was the testimony of the victim. It does no disrespect to Mr. Duopo to note that a single-witness identification of

---

[2] Poventud was convicted on four counts: attempted murder in the second degree, attempted robbery in the first degree, assault in the first degree, and criminal possession of a weapon.

2

this sort is hardly unassailable proof of Poventud's guilt.  Well-known scientific evidence gives us sound reasons to believe that eyewitnesses generally, and violent-crime victims specifically, are not always reliable observers or reporters.  The trauma of a highly frightening and stressful event and subsequent life experiences, including the confounding effects of potentially suggestive police investigatory procedures, often distort the victim's recollection.[3]  But it *would* disrespect Mr. Duopo to use our knowledge regarding the fallibility of human memory to disqualify his testimony and require the dismissal of all charges against a person that he, the crime victim, has positively identified as his assailant.  Thus, although we cannot be certain that Mr. Duopo's identification was correct, the law permits him to testify and the defense to cross-examine him, and allows jurors, acting as the conscience of the community, to decide whether the information before them is sufficient to persuade them beyond a reasonable doubt of the defendant's guilt.  It is the role of the jury, fairly apprised of the facts then known, to weigh the strengths and weaknesses of the evidence before them,

---

[3] See Young v. Conway, 698 F.3d 69, 88-89 (2d Cir. 2012) (collecting studies regarding the unreliability of eyewitness testimony), cert. denied, 134 S. Ct. 20 (2013); see generally State v. Henderson, 208 N.J. 208 (2011) (reviewing various social science research, laboratory experiments, and scientific evidence demonstrating that "an array of variables can affect and dilute memory and lead to misidentifications").

bearing in mind the inherent limitations on the victim's ability to observe, remember, and report what he saw. The jury at Poventud's first trial, after hearing the victim's account and Poventud's alibi defense, was persuaded beyond a reasonable doubt of his guilt.

The justice of relying on the jury's conclusion, however, depends critically on the assumption that the jury knew all of the relevant facts about the reliability of Mr. Duopo's identification. It turned out, however, that the jury had been deceived – not by Mr. Duopo, but by the authorities who covered up important evidence about how he came to identify Poventud.

When a codefendant also convicted of the robbery secured a new trial due to a legal error, evidence fortuitously came to light that Poventud's initial trial had not been fair. The rules had not been followed, and the result was not reliable. The breach was no mere technicality; it went directly to the truth-seeking function of the trial. The entire point of the first trial was to determine the reliability of Mr. Duopo's testimony, by fairly putting before the jury the facts that would reasonably bear on whether his identification was accurate. The state court would eventually determine, however, that the police officers investigating the case had deliberately hidden the fact that Mr. Duopo had earlier identified

4

someone else.  Perhaps a jury that knew that fact would still have found Mr. Duopo's identification sufficiently accurate to return a guilty verdict, or perhaps taken together with the fact, which they did know, that it was not until the fourth time that the police had shown him Poventud's picture that Mr. Duopo finally identified Poventud, the additional information would have created a reasonable doubt.  Surely, however, any reasonable juror would find this evidence highly relevant, and significantly damaging to the identification's reliability.  For that reason, the Supreme Court has made crystal clear that such evidence must be disclosed to the defense.  See Brady v. Maryland, 373 U.S. 83, 87 (1963).

Without question, covering up facts so damaging to the case against a defendant violates the defendant's legal rights.  This is not just a matter of the rules of the road.  By failing to disclose evidence that would cast significant doubt on the principal evidence of Poventud's guilt, the police did something tantamount to fabricating false evidence of guilt: they deceived the jury into thinking that the evidence of guilt was stronger than it was.  When this misconduct came to light, the state court did what the law, justice, and common decency required, and vacated Poventud's conviction.  At that point, the presumption of innocence was restored.  Poventud was no longer legally guilty

5

of the four offenses of conviction, and could no longer be punished.  By that time, however, Poventud had already served nearly nine years in prison as punishment for crimes of which he was then again presumed innocent.

The stage was now set for a second trial of the original charges.  Though now presumed innocent, Poventud still faced the *accusation* that he was Mr. Duopo's assailant, and he could be tried again – fairly this time, with all the facts known to the jury.  And perhaps, though it might seem unlikely, a new jury, exposed to all the facts, might still have convicted him.  At that point, however, another aspect of our system came into play, the institution of plea bargaining.  Neither the prosecution nor the defense can predict the future, and both were uncertain as to the likely outcome of a fair trial.  The prosecutors, no doubt in good faith, believed that they had the right man, and that a trial *should* result in another conviction.  But the chances of acquittal were obviously high.  Even assuming that Mr. Duopo were alive and well and available to testify, and would again identify Poventud as his assailant, nearly a decade had passed since the crime; his memory would be less clear, and his ability to persuasively identify anyone would be considerably less certain. Moreover, the jury assessing his testimony would now know, as the first jury had been prevented from knowing,

6

that Mr. Duopo had first identified someone who everyone agreed was not involved in the crime. With the prosecution's case significantly weakened, Poventud's alibi might look much more persuasive to the jury.

Poventud, however, could be no more confident than the prosecutors of the outcome of a new trial. Even assuming that he knew himself to be innocent, he also knew that he had been convicted once before, and he had already spent almost nine years in prison. Indeed, he remained a prisoner, because he lacked funds to pay his bail. Moreover, the prosecutors could appeal the vacatur of his conviction, and they successfully resisted his attempt to have his bail reduced so that he could remain at liberty while facing a second trial.

In these circumstances, the prosecutors offered Poventud an alternative to trial: if he pled guilty to a lesser offense, they would agree to a sentence of one year in prison – time he had long since served. In effect, if he accepted the plea bargain, he would be released from prison. Poventud thus faced a stark choice: he could continue to fight, risking the possibility that his sentence of up to twenty years in prison would be restored against the hope of a complete acquittal. Or, he could accept the offer, plead guilty, *and go free immediately*. Poventud accepted the offer: he pled guilty to attempted robbery in the third degree, was sentenced

to a fraction of the time he had already spent in prison, and walked out of the courthouse a free man.[4]

To recapitulate the results of the two trials of Marcos Poventud: at the first proceeding, corrupted by police misconduct, a jury that was ignorant of the truth about the identification witness, convicted him of attempted murder and three other crimes leading to nine years of imprisonment on a ten-to-twenty year sentence; at the second, he was convicted on his plea of guilty to third-degree attempted robbery and was sentenced to one year.

Now Poventud seeks damages from those who, in effect, fabricated evidence of his guilt by suppressing evidence that would have shaken, perhaps fatally, the identification testimony used to convict him. The defendants seek to have his suit dismissed, based on the same rule that would have prevented him from suing *while his initial conviction stood unchallenged*, arguing that a fairly obtained conviction by guilty plea (albeit to a lesser offense with sharply limited

---

[4] Poventud's guilty plea is legally valid. A defendant who is fully aware of the consequences of pleading guilty may enter a binding plea of guilty, notwithstanding powerful inducements to do so. At one point, Poventud sought to argue that his guilty plea was *not* lawfully taken, by moving to withdraw his guilty plea as the product of unfair deception by prosecutors – he claimed that the authorities had falsely told him that they would appeal the vacatur of his conviction, even though they had already decided not to. He later withdrew that motion, so we must treat the plea as legally binding.

consequences) prevents a suit seeking damages for the wrongful conduct that resulted in his earlier, more serious, now-vacated conviction, with its resulting drastically more serious punishments.

It seems to me, as it does to a majority of the judges of this Court, that the legal answer is simple. As Judge Wesley's opinion demonstrates, the Supreme Court's holding that a legally valid conviction prevents a suit "to recover damages for allegedly unconstitutional conviction or imprisonment" explicitly applies *only* until that "conviction or sentence has been reversed on direct appeal, expunged by executive order, *declared invalid by a state tribunal authorized to make such determination*, or called into question by a federal court's issuance of a writ of habeas corpus." Heck, 512 U.S. at 486-87 (emphasis added). Poventud seeks to recover damages for his initial conviction and for that portion of his lengthy imprisonment that was attributable to that conviction. That conviction exists no longer; a state court declared it invalid, and we must accept the outcome of the legal process that holds him not guilty of those offenses. Heck thus does not bar his suit.

It seems to me that the answer is equally simple from the standpoint of simple justice. The state court decided that Poventud was not fairly tried, and

that the police deliberately suppressed evidence helpful to the defense in order to make the case against him appear stronger than it was. His conviction of four crimes including attempted murder, and sentence to 10 to 20 years in prison is a legal and moral nullity, the result of a trial deliberately corrupted by the police. Whether or not prosecutors might have successfully appealed that judgment, or obtained the same conviction again after a second, fair trial, they chose not to take those risks; whether or not Poventud would have been acquitted at a second trial, he too elected not to take his chances. Our best – however imperfect – approximation of the result that would have come from a fair trial is the result of the plea bargain: conviction on a single, much less serious count, and a sentence to only a year in prison.

We must accept as binding the outcome of these criminal proceedings: that Poventud, at an unfair trial, suffered a much more serious conviction and punishment than he received from a fair proceeding, with all the facts known. By the same token, however, Poventud must accept the other outcome of the legal process: his conviction, by plea of guilty, of the offense of attempted robbery in the third degree, and his sentence to one year of imprisonment. Irrespective of the difficulty of his choice to plead guilty, Poventud is legally guilty of that

offense. He therefore may not argue that he was wrongly prosecuted or charged; he cannot claim that he was unfairly convicted of a crime, or that he was wrongly required to serve a year in prison. But he certainly may argue that his initial, more serious conviction was wrong, and *wrongful*, and that as a result of deliberately unfair and corrupted processes he was forced to serve many additional years in prison.[5]

## II

There is thus a certain common sense, rough justice to the idea that Poventud can seek damages for the difference between the outcomes of his first and second processes, the first conducted outside the rules and the second within them. It is reasonable to ask, however, where is the *truth* in all of this. I think any fair-minded person will agree that the trial that led to Poventud's initial conviction was deeply – and intentionally – corrupted, and that its result is unreliable. But Poventud has now admitted, under oath (albeit under deeply questionable circumstances) that he was indeed involved in the robbery. Are we

---

[5] On these points, I believe that Judge Chin's position is entirely consistent with that of the Court. The difference between the majority's position and Judge Chin's is not about what Poventud may or may not argue in his civil lawsuit, but only about whether his complaint *has* sought to make arguments that go beyond what the Court permits, and accordingly whether some portion of that complaint must be dismissed.

to award damages, in effect, for the fact that Poventud lost the opportunity to be acquitted of a crime that he may very well have committed because the rules were not followed?

I believe that we must. As a matter of law, in order to prevent the horror of convicting an innocent person, we insist that someone charged with a crime may only be convicted and punished if the state can prove his or her guilt by a very demanding standard of proof, beyond a reasonable doubt. If a defendant cannot be thus proven guilty – if the evidence, however *suggestive* of guilt it may be, does not rise to a sufficient level of strength, that defendant must be declared not legally guilty of the crime charged. And certainly, if a defendant is found legally guilty by a jury that has been deprived of the full story by government misconduct, that conviction is void.

But do we not now *know* that Poventud is guilty, as a matter of fact, because of his plea? I submit that we know no such thing. Poventud is *legally* guilty of the crimes he was convicted of by a putatively fair process. That guilt is as much a matter of legal convention as is his legal innocence of the more serious charges of which he has never been fairly convicted.

No one who was not there will ever know for certain whether Marcos

12

Poventud participated in the robbery of Younis Duopo on March 6, 1997. Our ignorance on that score is not a function of any weaknesses of our criminal justice system; rather, it is a function of the limited scope of human knowledge. Our legal system searches for the truth, but humankind lacks the capacity to obtain absolute knowledge of the truth about past events. Cognizant of our limitations, we nevertheless must act on the basis of the best information we can glean. To that end, we have devised a system of trials and proof, by which we attempt to develop objective evidence in order to make the best judgments we can about the facts. As much as we strive to improve that system, so long as we remain human, our legal system will remain imperfect. Mistakes are inevitable. The best we can do is to follow our procedures, as imperfect as we know they are, and accept and act upon the results that they produce.

At the conclusion of Poventud's first trial, on the then-valid assumption that the jury had been able to make a full and fair judgment of the strength of the evidence against him, society was justified in punishing Poventud. Some might well argue that we could and should devise better procedures for testing identification evidence, but we must act under the rules we have been able to agree on at present, and under those rules, the evidence was strong enough for a

13

*legal* finding of guilt.

It does not follow from the jury's verdict that, in the eye of an omniscient God, Poventud was actually guilty. We know, to our sorrow, that there remained some risk that Mr. Duopo was mistaken and that he identified the wrong man. If the trial was fair, however, it was the duty of the court to impose punishment. If at some later date, overpowering proof of his innocence were to emerge, we would vacate his conviction, and a decent society would seek to compensate him, in some necessarily inadequate way, for the tragic error. But if the trial was fair, and the witnesses honest, no one would have done Poventud a legal wrong. If everyone involved – the victim, the police, the prosecutor, the judge and jury – acted honorably and justly, any resulting mistake would be attributable simply to human imperfection. At the end of his first trial, then, Poventud was legally guilty of four offenses and was justly punished, whether or not in actual fact he had committed those crimes. So long as the result of his trial stood unimpaired, Poventud's four-count conviction and sentence of 10 to 20 years' imprisonment was legally correct, and, as a matter of law, Poventud was barred from suing anyone he believed did him wrong by acting dishonorably within the process that led to his conviction.

14

Those legal consequences could not stand, however, once it became clear that the trial was not fair, that the rules had not been followed, that some of the authorities whose job was to collect and present the evidence fairly had not behaved honorably, that even within the assumptions of our already fallible system the result was not reliable. Just as the jury's verdict, premised on what we erroneously thought was a fair trial, made it *legally* true that Poventud was guilty, whether or not he had *actually* committed the crimes, vacatur of the unfairly obtained conviction restored Poventud's *legal* presumption of innocence, but did not mean that Poventud did *not* commit the crime. The newly discovered evidence of police misconduct does not prove Poventud's innocence; it only makes it somewhat less likely that he is guilty. Perhaps the police manipulation of the evidence led to an innocent man's conviction, but perhaps it unfairly strengthened the case against the real robber.

In principle, the stage was then set for a second, fairer trial, with all of the evidence available now to be presented to a new, unbiased jury. But the ability of such a second trial to find the "real" truth had surely been compromised. The police misconduct had not only prevented a fair trial in the first place, but given the lapse of time before that misconduct was discovered, it was no longer

15

possible to replicate those original conditions. Almost nine years later, Mr. Duopo's identification testimony would be undermined not only by the newly discovered impeaching evidence, but by the sheer passage of time. To that extent (through no fault of his own, of course), Poventud's chances of acquittal were *unfairly* improved. That is why the prosecutors were moved to offer their compromise proposal, by which Poventud could obtain immediate freedom in exchange for an admission of guilt to a lesser crime.

Critics of American criminal justice may decry the very existence of plea bargaining. But we permit such arrangements, in large part on the theory that, if both sides are reasonably aware of the risks and likely outcomes of a trial, and of the strength of the case against the defendant, a compromise outcome may well be both procedurally fair and substantively just. But whatever the general merits and demerits of such a system, it too was corrupted by the initial wrong that undermined Poventud's first trial. Just as the prosecutor's case was weakened by the passage of time, so was Poventud's ability to make a fair choice between alternatives. The choice of freedom in exchange for an admission would be easy for a guilty man, but even an innocent one would be hard pressed to decline the prosecution's offer. A hero might resist the bargain and insist that he would not

16

accept the ignominy of falsely admitting guilt.  One is reminded of John Proctor,

falsely accused of witchcraft in Arthur Miller's play <u>The Crucible</u>, who goes to

the gallows rather than accept an offer that would let him go free in exchange for

a false confession.  It is difficult to expect such heroism of mere mortals.  Proctor,

though based on a historical figure, is after all a fictional character, and even he

first signed the false confession before having a change of heart.  Poventud did

what I suspect most ordinary human beings would do in his situation, even if

they were innocent.

Within the rules of our system, however, having pled guilty to a crime

connected to the robbery, Poventud is *legally* guilty of that crime.  We, and he,

must accept the outcome of the new, putatively fair, proceeding.  Assuming, as

we must, that Poventud's guilty plea was legally taken, Poventud is now *legally*

guilty of attempted robbery in the third degree, and was fairly punished by one

year of imprisonment.  But we still do not know with certainty, any better than

we knew before his first trial, whether Poventud actually robbed Mr. Duopo.  A

confession in open court is ordinarily powerful evidence of guilt, but we know

that false confessions have been obtained by pressures much less imposing than

17

those to which Poventud was subjected.[6]

The legal process, as the dissenters correctly note, is a search for truth. The rule that the police violated here is one that is designed to make it more likely that the truth will be found. But the truth is elusive, and can never be known with certainty. Our legal procedures, even at their best, can only produce a provisional truth, a legally accepted truth, an approximation of the truth that is good enough to act upon, though known to be imperfect. I understand, and agree with the dissenters, that a defendant cannot disavow legal guilt for an offense to which he has lawfully pled guilty, no matter how much he might claim, and whether or not an impartial observer might believe, that his choice to plead guilty was made under circumstances under which an innocent person might well enter such a plea. Poventud, as I have noted and as the Court concludes, must accept the consequences of that plea.

But the dissenters appear to insist that his guilty plea represents not just a legal truth, but an existential one. According to the dissenters, Poventud's plea

---

[6] See, e.g., People v. Wise, 752 N.Y.S.2d 837, 850 (N.Y. Sup. Ct. N.Y. County 2002) (vacating convictions of Central Park Five); see generally Steven A Drizin & Richard A. Leo, The Problem of False Confessions in the Post-DNA World, 82 N.C. L. Rev. 891 (2004) (analyzing 125 cases in which "indisputably innocent individuals confessed to crimes they did not commit").

requires us to treat him not only as if he were guilty of the lesser offense of which

he is *legally* guilty, and justly subjected to the relatively short sentence that he

accepted, but also as if he had been fairly convicted of the far more serious

crimes, and fairly subjected to the drastically more stringent sentence, that

resulted when the authorities cheated and suppressed evidence that might have

led to his acquittal.[7]  That version of "the truth," however, has no basis in law:

Poventud never pled guilty to those more serious offenses, and he was found

guilty of them only after a deliberately and tortiously flawed process.  Poventud

seeks to sue the defendants because they distorted the search for the truth and

obtained a conviction that cannot fairly stand.  As the dissenters correctly note,

the very purpose of the rules that the defendants violated is to "ensure that

[such] miscarriage[s] of justice do[] not occur."  See Dissenting Op. of Judge

Jacobs, post, at 14-15.

To hold that the legal system must stand by the results it fairly generates

---

[7] Judges Jacobs and Livingston both would exalt Poventud's plea allocution by characterizing it as a "solemn admission."  Dissenting Op. of Judge Jacobs, post, at 6; see also Dissenting Op. of Judge Livingston, post, at 7.  But Poventud's plea is no more "solemn," and no less self-serving than his sworn testimony at trial, which Judge Livingston characterizes as perjurious.  Id. at 2.  In each case, Poventud was under oath; in each case, he said what was in his interest to say at the time.  With respect, it seems to me that it is the dissenters who are "pick[ing] and choos[ing]," id. at 12, which of Poventud's statements they prefer to believe.

19

according to its rules is not to espouse a "sporting theory of justice." Id. at 1. We seek accurate results, reached by fair procedures. We do the best we can, and we live with the results. The result of the legal process here is that Poventud is legally guilty only of a lesser offense and worthy of a lesser punishment, and that he suffered drastically more serious consequences as a result of deliberate wrongdoing. It is no more a "sporting theory" to insist that society stand by the part of the resulting criminal judgment that found Poventud not liable for that portion of his punishment that was unfairly obtained than it is to deny him any right to argue that he is innocent of the crime to which he pled guilty when presented with an offer that perhaps only a hero could refuse. It seems to me deeply inconsistent for the dissenters to insist (rightly in my and the Court's view) that Poventud is bound by the legal fact of his guilty plea, despite the very real possibility that he might have been factually innocent notwithstanding the plea, but then to refuse to accept the legal fact that Poventud was unfairly subjected to greater punishment because of the equally real possibility that he might have been factually guilty notwithstanding the prosecution's inability to convict him of the greater crimes for which he suffered that punishment.

To stand by the results that our system produces is simply to accept the

limitations of our knowledge, and the inevitable separation between a truth that we cannot fully know, and the judgments reached by inevitably flawed human processes. The dissenters would accept Poventud's plea not merely as legal truth, but as an absolute truth that frees the defendants from accountability for having distorted the truth-seeking process to his detriment. The Court correctly treats all aspects of the outcome as specific legal judgments with very particular legal consequences, but nothing more. Poventud now seeks to argue to a jury that he should be awarded damages for the difference between the consequences that resulted from a legally conducted process and those he was forced to suffer as a result of an unfair, distorted one, from the persons he claims are responsible for the obstruction of the truth-seeking process. The Court correctly permits him the opportunity to make that argument.

RAYMOND J. LOHIER, JR., *Circuit Judge*, *concurring*:

I agree with the majority opinion. Because the nature of Poventud's claims lies at the heart of our in banc dispute, I write separately to address how we identify those claims and how the dissenting opinions misconstrue them.

The Second Amended Complaint (the "Complaint") alone properly frames our understanding of Poventud's claims. We ignore the extraneous assertions in Poventud's summary judgment and other briefs in determining what claims he asserted. Moreover, we construe the Complaint in the light most favorable to Poventud, the non-moving party, and draw all inferences and resolve all ambiguities in his favor. *See Gould v. Winstar Commc'ns, Inc.*, 692 F.3d 148, 157-58 (2d Cir. 2012).

The dissenting opinions view the Complaint as littered with assertions of Poventud's actual innocence. As a result, they construe the Complaint as ultimately alleging actual innocence as the basis for Poventud's *Brady* claim, and they conclude that the claim "'sounds in' malicious prosecution." Dissenting Op. of Judge Jacobs, *post*, at 31. There are two problems with their reading. First, even if the Complaint had contained a malicious prosecution claim, the dismissal of that claim on summary judgment would not require the dismissal of

Poventud's *Brady* claim, which in no way depends on a showing of actual innocence. Second, reading the Complaint broadly to claim malicious prosecution or actual innocence neglects our appellate obligation to read the Complaint in a manner – here, narrowly – that favors rather than maligns Poventud's position.

Indeed, under any reading of the Complaint I have trouble uncovering a claim of actual innocence. The allegations concerning Poventud's *Brady* claim are contained in paragraphs 115 to 125 of the Complaint and state that the officers "lied about, and otherwise failed to disclose the *Brady* material." *See, e.g.*, Second Am. Compl. ¶ 118. Paragraph 121 alleges that the officers' "conduct operated to deprive Plaintiff of his rights . . . to timely disclosure of all material evidence favorable to the defense" "and to not be convicted or punished based upon the government's knowing use of false or misleading testimony." *Id.* ¶ 121. Nowhere in these paragraphs does Poventud allege that he was actually innocent.

In urging a contrary view, my dissenting colleagues point to paragraph 128. That paragraph states that the undisclosed material "included, but was not limited to, evidence of innocence, evidence that an identifying witness was

2

unreliable, and evidence impeaching the credibility of significant prosecution witnesses." *Id.* ¶ 128. I grant that one might be able to read paragraph 128 as broadly as possible and conclude that it constitutes a claim of actual innocence. But such a reading again neglects our duty to construe the Complaint in the light most favorable to Poventud. *Gould*, 692 F.3d at 157-58. As a textual matter, the phrase "there is evidence of innocence" is not synonymous with the claim "I am innocent." Rather, the more natural reading of Poventud's reference to "evidence of innocence" is simply that the withheld evidence was *material* for *Brady* purposes – in other words, that it would have tended to lead to a verdict of not guilty at trial.

Confined by the allegations in the Complaint and read fairly and narrowly, as they should be, Poventud's claims clearly concern "the misdeeds of the police prior to his jury trial, and nothing more." Maj. Op., *ante*, at 39. So read, they neither sound in malicious prosecution nor proclaim Poventud's actual innocence.

To ensure that the relevant record is straight, I attach the Complaint in its entirety as an appendix.

DENNY CHIN, *Circuit Judge*

I respectfully concur in part and dissent in part.  I believe the district

court correctly held that plaintiff-appellant Marcos Poventud's claims were based

on factual allegations that are inconsistent with his 2006 conviction for attempted

robbery.  I agree, however, that the judgment should be vacated and the case

remanded for further proceedings to the extent that Poventud's claims do not

imply the invalidity of his 2006 conviction.

**I**

The question presented is whether Poventud's claims under *Brady v.*

*Maryland*, 373 U.S. 83, 87 (1963), are barred by the Supreme Court's decision in

*Heck v. Humphrey*, 512 U.S. 477, 486-87 (1994).  *Heck* requires the district court to

consider:

> [W]hether a judgment in favor of the plaintiff would necessarily
> imply the invalidity of his conviction or sentence; if it would, the
> complaint must be dismissed unless the plaintiff can demonstrate
> that the conviction or sentence has already been invalidated.  But if
> the district court determines that the plaintiff's action, even if
> successful, will *not* demonstrate the invalidity of any outstanding
> criminal judgment against the plaintiff, the action should be allowed
> to proceed, in the absence of some other bar to the suit.

512 U.S. at 487 (footnotes omitted). The *en banc* majority concludes that *Heck* does not bar Poventud's claims. I disagree, in part.

The Second Amended Complaint (the "Complaint") asserts only one cause of action against the individual defendants, for denial of due process and a fair trial. (Compl. ¶¶ 115-25) (Dkt. No. 52). That one cause of action, however, is based on several factual claims, including Poventud's contentions that the police failed to disclose that the victim (Younis Duopo) identified Poventud's brother (Francisco) and thereafter covered up and lied about this evidence.

But there are other factual claims in the Complaint as well. The Complaint alleges, at least implicitly, that one of the detectives planted Francisco's wallet in the backseat of the livery cab. (*Id.* ¶¶ 13-17, 36-38). It alleges that after Duopo incorrectly identified Francisco, the detectives targeted Poventud and manipulated Duopo into falsely identifying Poventud. (*Id.* ¶¶ 22-33, 45-46). It asserts that three other men, one of whom resembled the description of the shooter provided by Duopo, were arrested approximately two weeks later in the same general vicinity for robbing a livery cab with the same weapon that had been used to shoot Duopo. (*Id.* ¶¶ 42-44). It alleges, at least implicitly, that Poventud was not at the scene of the robbery because he was at a neighbor's apartment playing video games when the crime occurred. (*Id.* ¶ 40).

-2-

All of these factual claims paint a picture of innocence, and thus they necessarily imply the invalidity of Poventud's 2006 conviction. Indeed, the Complaint characterizes the purportedly exculpatory evidence as "evidence of innocence" (*id.* ¶ 128), and Poventud argued, in his opposition to defendants' summary judgment motion below, that he "*is* innocent." (Pl.'s Mem. in Opp'n to Mot. for Summ. J., at 1 (Dkt. No. 68) (emphasis in original); *see also id.* (plaintiff "could continue to maintain his innocence . . . [o]r, he could admit a crime he had not committed and be *released -- immediately*") (emphasis in original)).[1]

Poventud is not, however, innocent, as his 2006 conviction makes clear. He pled guilty to attempted robbery in the third degree, and admitted to a state court judge that he was present at the place and time of the robbery and that he attempted to steal personal property from another person by using force, *i.e.*, a weapon. Hence, the wallet was not planted, Duopo correctly identified Poventud, and Poventud was not at a neighbor's apartment playing video games.

The district court, of course, decided the case that was before it, and it recognized that Poventud's claims were centered on his claim of innocence. It

---

[1] On appeal, while Poventud argues that his claims are not dependent on his innocence (*see* Appellant En Banc Br., at 24 ("he does not, for the purpose of his claim, assert, or need to establish, that he is innocent")), he has continued to argue that he is in

concluded -- correctly, in my view -- that Poventud's factual assertions called into question the validity of his 2006 conviction. *See Poventud v. City of New York*, No. 07-civ-3998(DAB), 2012 WL 727802, at *3 (S.D.N.Y. Mar. 6, 2012). Hence, I do not believe that the district court erred, as the *en banc* majority suggests, in measuring Poventud's admissions in his guilty plea against the factual assertions of his *Brady* claim. (*See* Maj. Op., *ante*, at 28-29).

The *en banc* majority observes that "*Brady* does not require actual innocence, and even "'[a] guilty man is entitled to a fair trial."'" (Maj. Op., *ante*, at 36 (quoting *People v. Buchalter*, 289 N.Y. 181, 225 (1942) (Lehman, *Chief Judge*, concurring))). I do not disagree. Moreover, I agree that Poventud was entitled to the disclosure of exculpatory evidence, regardless of whether he was guilty or innocent. He was entitled to know that Duopo had identified Francisco, even though Francisco was undeniably the wrong man. I have trouble, however, with the notion that Poventud can ask a jury for damages now based on the argument that he had the right to try to persuade the jury in 1998 that he was *not* present -- when he admitted in his guilty plea that he *was* present and participated in the robbery. Indeed, I do not accept the proposition that Poventud should be able to argue to a jury now that had he known about Duopo's misidentification of

---

fact innocent (*see, e.g.*, *id.*, at 5 ("Poventud had sworn his innocence for nine years.")).

-4-

Francisco in 1998, he would have been able to persuade the jury then that he was not present at the robbery -- when he was in fact there.

Accordingly, I believe the district court correctly held that Poventud's claims, to the extent discussed above, call into question the validity of his 2006 conviction.

## II

I agree with the majority that there are claims in the case that Poventud may pursue that do not call into question the validity of his 2006 conviction. Where a conviction is set aside because of a *Brady* violation, a subsequent guilty plea will not necessarily foreclose all claims for damages, for there may be claims that do not impugn the integrity of the guilty plea.[2] One could imagine such a situation, for example, where police officers withheld exculpatory information about the presence of a weapon at the scene in a

---

[2] To establish a *Brady* violation, a claimant must show that "[t]he evidence at issue [is] favorable to the accused, either because it is exculpatory, or because it is impeaching; [the] evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *DiSimone v. Phillips*, 461 F.3d 181, 192 (2d Cir. 2006) (quoting *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999)). To establish prejudice a plaintiff must show materiality. As the Supreme Court has explained, the "touchstone of materiality is a 'reasonable probability' of a different result, and the adjective is important. The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Kyles v. Whitley*, 514 U.S. 419, 434 (1995).

burglary case. If the defendant is convicted of burglary in the second degree and later discovers that the police failed to disclose exculpatory evidence about the presence of the weapon, the defendant could still pursue a § 1983 claim based on the *Brady* violation even if the conviction is vacated and he subsequently pleads guilty to burglary in the third degree. Such a claim would not call into question the validity of the guilty plea, as the defendant could argue that the weapon was not his and that he was injured by the *Brady* violation as he was convicted of the more serious offense of burglary in the second degree.

Although Poventud's 2006 conviction forecloses arguments as to his innocence or his presence at the scene of the crime, he may still show that defendants' alleged actions caused him harm, as he asserts a number of claims that do not call into question the validity of his guilty plea. The Complaint alleges, for example, that defendants "knew that Duopo's misidentification of Francisco Poventud was highly relevant to the Bronx District Attorney's evaluation of the strength of the evidence against [him]" and "to the court's decision whether to grant reasonable bail." (Compl. ¶ 47; *see also id.* ¶ 53 ("the court was misled concerning the strength of the case against Plaintiff and set prohibitively high bail of $100,000, causing Plaintiff to be incarcerated until trial")). Poventud may be able to prove that had the *Brady* evidence been

disclosed, his bail would have been set at a lower amount, he would have been able to make bail, and he would not have been imprisoned for the full nine years before pleading guilty to a lower level felony.

Furthermore, Poventud alleges that at least one of the defendants (Umlauft) continued to lie to and mislead prosecutors by denying that any undisclosed identification had occurred. (*Id.* ¶¶ 2, 117, 120). Poventud had a "right not to be deprived of liberty as a result of the fabrication of evidence by a government officer acting in an investigatory capacity." *Zahrey v. Coffey*, 221 F.3d 342, 344 (2d Cir. 2000). The Complaint contends that after Poventud filed his motion to vacate his conviction based on the *Brady* violation, Umlauft lied to the new prosecutor (Shockett), stating he had indeed disclosed the misidentification to both the original prosecutor (Turkin) and defense attorneys at the time of trial. (Compl. ¶¶ 103-06). Poventud also contends that Turkin informed Shockett that Umlauft never disclosed the *Brady* material, but Shockett did not share Turkin's account with the defense. (Appellant En Banc Br., at 18-19). Accordingly, the State opposed Poventud's motion by submitting Umlauft's false affidavit and relied on Umlauft's false testimony at an evidentiary hearing. (Compl. ¶¶ 107-10). Moreover, Poventud argues that, based on Umlauft's continued lies, the State filed a notice of appeal of the trial court's finding that a *Brady* violation

occurred at Poventud's first trial and successfully opposed Poventud's bail

motion.  (Appellant En Banc Br., at 15-16).  These are claims that Poventud could

at least arguably pursue without impugning the integrity of his guilty plea.

### III

In sum, while I believe that the district court correctly held that

Poventud's 2006 conviction forecloses any claims asserting that he was innocent

or that he was not present at the scene of the crime, I agree that the Complaint

sets forth claims that Poventud may pursue without necessarily impugning the

validity of his guilty plea.  These claims, in my view, are not foreclosed by *Heck*.

DENNIS JACOBS, <u>Circuit Judge</u>, dissenting:

In <u>Heck v. Humphrey</u>, 512 U.S. 477 (1994), the Supreme Court ruled that a proper respect for finality and consistency of judgments bars actions under 42 U.S.C. § 1983 that require "impugning" an extant conviction. <u>Id.</u> at 486 n.5. In <u>Brady v. Maryland</u>, 373 U.S. 83 (1963), and its progeny, the prosecution's constitutional obligation to disclose information that is material to the defense has been located in the truth-seeking function of a trial, and not in any "sporting theory of justice." <u>Id.</u> at 90. The majority opinion undermines both the finality premise of <u>Heck</u> and the truth-seeking foundation of <u>Brady</u>. It holds that Marcos Poventud, who secured a new trial from the State of New York based on a police officer's failure to disclose information that might have impeached the victim's identification of Poventud as the armed robber of a livery cab, can sue for <u>Brady</u> damages even though Poventud resolved the charges against him on remand by entering a guilty plea (to a lesser offense) that made clear that the eyewitness identification was sound, and that Poventud's alibi defense at the first trial was perjury.

I respectfully dissent from this decision and write to explain why the majority's reasoning impairs the future application of <u>Heck</u> and <u>Brady</u> in this

1

Circuit.

## I

On the evening of March 6, 1997, between Oliver Place and Marion Avenue in the Bronx, a livery cab driver, Younis Duopo, was held up at gunpoint and shot in the neck. Poventud and a co-defendant were indicted for the armed robbery and attempted murder. At Poventud's trial, the central issue was identity: Poventud and some of his friends testified that on the date and at the time of the robbery, he was with them elsewhere, playing video games; Duopo, the victim, identified Poventud as his assailant, both pretrial from a photo array and again at the trial itself.

Rejecting Poventud's testimony and crediting the victim's identification, the jury convicted Poventud of attempted murder in the second degree, attempted robbery in the first degree, assault in the first degree, and criminal possession of a weapon in the first degree. He was sentenced to serve an indeterminate sentence of 10 to 20 years. The conviction and sentence were affirmed on appeal. See People v. Poventud, 300 A.D.2d 223, 224, 752 N.Y.S.2d 654 (1st Dep't 2002).

In 2005, the New York Supreme Court, Bronx County, vacated the

2

conviction and ordered a retrial on the ground that the prosecution had failed to disclose impeachment evidence in violation of <u>Brady</u>. Immediately after the hold-up, police found photo identification of Poventud's brother, Francisco, in a wallet found in Duopo's cab. From a photo array, Duopo selected a photograph of Francisco, which he initialed and dated. When it was ascertained that Francisco had been in prison at the time of the crime, Marcos Poventud became a suspect. The state court vacated on the ground that <u>Brady</u> was violated by the State's failure to disclose Duopo's initial identification of Francisco as the assailant. <u>See</u> <u>People v. Poventud</u>, 10 Misc. 3d 337, 341, 802 N.Y.S.2d 605 (N.Y. Sup. Ct. 2005). A new trial was ordered.

The vacatur afforded Poventud the opportunity to test the reliability of the identification before a jury on retrial, but he chose instead to resolve the outstanding charges by pleading guilty to the lesser included offense of attempted robbery in the third degree. At the ensuing guilty plea proceeding, Poventud admitted his armed presence at the scene and his participation in the robbery:

> COURT: In this case it's charged that on or about March
> 6, 1997, at approximately 8:40 in the evening, in the area
> of Oliver Place and Marion, M-A-R-I-O-N, Avenue here

3

in the county of the Bronx, you did attempt to steal personal property from another person by using force, in that you used a weapon in your attempt to steal personal property. Are those charges true?

THE DEFENDANT: Yes.

This plea colloquy thus conclusively confirmed the jury's key findings of fact: that Duopo's ultimate identification of Marcos Poventud was sound and that Poventud's trial testimony (and that of his friends) was false.

Poventud was re-sentenced to one year in prison and, having already served nine years, was released.[1] Soon after his release, Poventud filed this action under 42 U.S.C. § 1983 seeking money damages for alleged violation of his Brady right. He then obtained a stay of that action and filed (but later withdrew) a motion challenging the voluntariness of his plea. On defendants' motion for summary judgment in the § 1983 action, Judge Batts ruled that Poventud's claims were barred by Heck, and dismissed the case. See Poventud v. City of New York, No. 07 Civ. 3998 (DAB), 2012 U.S. Dist. LEXIS 30763, 2012 WL 727802 (S.D.N.Y. Mar. 6, 2012).

---

[1]   Judge Lynch argues that the one-year sentence of the plea-bargain here is an "approximation of the result that would have come from a fair trial," Concurring Op. of Judge Lynch, ante, at 10, as though a prosecutor would not take account of the time already served in negotiating a plea following vacatur.

4

On Poventud's appeal of Judge Batts's ruling, the three-judge panel of this Court divided. See Poventud v. City of New York, 715 F.3d 57 (2d Cir. 2013). The majority held that the Heck bar is subject to a gaping, unprecedented exception: namely, that any person convicted of a crime can bring a § 1983 action necessarily implying the invalidity of that conviction if he cannot currently bring a habeas petition--including any person released from prison after the service of his sentence. The dissent rejected that theory and concluded that Poventud did not benefit from any exception to Heck (if one even exists).

A majority of the active judges voted to decide in banc the scope of the Heck bar and (if necessary) any exceptions to it. The in banc majority again reverses the district court's dismissal. In doing so, however, it abandons the panel majority's reasoning, relying instead on a point of law that received merely passing reference in a footnote to the panel majority's opinion. See Poventud v. City of New York, 715 F.3d 57, 61 n.2 (2d Cir. 2013) (expressing doubt that

5

success on § 1983 claim would impugn Poventud's guilty plea, but declining to reach the issue).

## II

Poventud's 2006 judgment was entered on his guilty plea, made in open court and with the assistance of counsel, and has not been disturbed.[2] Poventud's solemn admission of guilt, which places him at the scene of the crime, armed, with the intent to commit robbery, "<u>quite validly</u> removes the issue of factual guilt from the case," <u>Menna v. New York</u>, 423 U.S. 61, 62 n.2 (1975) (per curiam) (emphasis in original), and is admissible against Poventud for all purposes, <u>Mitchell v. United States</u>, 526 U.S. 314, 324 (1999).

The majority opinion does not dispute that, if the success of a § 1983 claim would necessarily impugn a criminal conviction, the complaint must be dismissed unless the plaintiff can "prove that the conviction . . . has been reversed on direct appeal, expunged by executive order, declared invalid by a

---

[2]   Judge Lynch is radically skeptical about the plea, even though it is the only fact that is authoritatively settled; but he treats as true (and deplores) (1) findings of the state court that were discredited by the plea, and that in any event do not bind any defendant here, <u>see</u> <u>infra</u> at 17-18 & n.5, (2) allegations of the Complaint, which we treat as true solely as a tool of analysis, and (3) sworn statements made by Poventud for the purpose of litigation.  Judge Lynch subjects only the plea itself to metaphysical tests of knowability.

state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus." Heck, 512 U.S. at 486-87; see also Wallace v. Kato, 549 U.S. 384, 393 (2007)(noting that Heck bar applies where § 1983 claim would necessarily "impugn" an extant conviction). None of those things have happened here.

The in banc majority nevertheless holds (1) that Poventud may sue for damages pursuant to § 1983 on the theory that Poventud's Brady-based § 1983 claim does not impugn the (extant) judgment entered on his guilty plea, and (2) that the (vacated) judgment entered on his 1998 conviction was favorably terminated within the meaning of Heck. I will take these two determinations one by one, to show that Poventud's claim--as pled and as rewritten by the majority--impugns the 2006 judgment, see infra Points III, IV, V, and that the vacatur of the 1998 judgment was not a favorable termination because it culminated in the guilty plea, see infra Point VI.

### III

Because Poventud's guilty plea is central to the two-part showing I have just summarized, I begin with an overarching point: Poventud's complaint unambiguously impugns the validity of his guilty plea by asserting actual

7

innocence. The complaint does this, moreover, both as it is pled and as it is presented on the motion for summary judgment.

The Second Amended Complaint (the "Complaint") alleges that the prosecution's evidence that Poventud was present at the crime scene was inherently unreliable, and even insufficient itself to sustain a conviction. See Second Am. Compl. ¶¶ 36-41, 69-74, 128. The Complaint characterizes the withheld evidence as "evidence of innocence." Id. ¶ 128.

Poventud's sworn affidavit submitted in opposition to defendants' motion for summary judgment on Heck grounds declare his innocence in unequivocal terms: "I did not commit the crime. I am innocent." Aff. of Marcos Poventud, ¶ 5 (July 19, 2011). So too does his opposition briefing impugn his guilty plea directly: "Plaintiff knew that maintaining his innocence had resulted in spending nine years in prison, and bowed to the pressure to 'admit' guilt because it would result in his immediate release." Pl's Resp. to Defs' Rule 56.1 Statement and Statement of Additional Facts, ¶ 269. Finally, Poventud's damages theory, as set out in his summary judgment papers, is squarely premised on having served jail time notwithstanding his innocence or, at best, on having served time in excess of the one-year sentence on his 2006 conviction.

8

Moreover, Poventud's briefs to the three-judge panel everywhere declare his innocence and attack the reliability of his guilty plea.  So do his papers on rehearing <u>in banc</u>: Poventud repeats the claim that his guilty plea was obtained through coercion, and thus is entitled to no credence: "[Poventud's] allocution to the 'facts' consisted of answering 'yes,' unsworn, to the court's summary of the allegations against him."  Appellant's Br. 16-17.

Throughout this entire litigation, then, Poventud has categorically insisted that he is innocent of any participation in the Duopo robbery and that his 2006 plea was obtained through coercion.  The majority opinion, for reasons easy to understand, undertakes to recast Poventud's claim as seeking damages only for the procedural impairment of his original trial, and posits that Poventud might just prevail if he follows the majority's lead and seeks damages on different allegations of fact for a different loss and on a different theory.  But Poventud, a savvy and counseled litigant, is the "master of the complaint," and his allegations, submissions, and underlying theories of liability and damages should be taken at face value.  <u>Holmes Grp., Inc. v. Vornado Air Circulation Sys., Inc.</u>, 535 U.S. 826, 831 (2002) (internal quotation marks omitted).  Now, after two amendments to Poventud's complaint, a summary judgment motion on <u>Heck</u>

grounds, a thorough district court opinion, a full appeal to a three-judge panel

(complete with dissent), and consideration in banc after further briefing and oral

argument, it is not premature to decide this case on the consistently-argued

allegations and theories of the plaintiff.

Poventud's guilty plea--placing him at Duopo's shooting, armed, with the

intent to commit robbery--simply "c[an]not be reconciled with the claims of his

civil action," VanGilder v. Baker, 435 F.3d 689, 692 (7th Cir. 2006): Poventud

swears that he "was nowhere near the crime scene at Oliver Place and Marion

Avenue." Poventud Aff. ¶ 6. Thus, Heck plainly bars this action unless

Poventud can invoke some Heck exception, a proposition we foreclose.[3] See infra

---

[3]    As to Judge Chin's opinion, we are in accord with his doctrinal analysis in Point I, supra. We respectfully differ with Judge Chin, however, as to the limited reversal he proposes. Judge Chin identifies the following surviving Brady "claims": misleading the district attorney when he gauged the strength of the case (pretrial and post-vacatur); and misleading the state court in the setting of bail. See Concurring Op. of Judge Chin, ante, at 6-7. However, Brady is a trial right, formulated to safeguard the fairness of trial outcomes; it does not require disclosure of impeachment evidence during pretrial events, however critical. See United States v. Ruiz, 536 U.S. 622, 633 (2002) (holding that the failure to disclose impeachment evidence prior to a guilty plea does not amount to a Brady violation); Friedman v. Rehal, 618 F.3d 142, 154 (2d Cir. 2010) (considering that Ruiz's reasoning likely also extends to exculpatory evidence) (citing 6 LaFave, et al., Criminal Procedure § 24.3(b), at 369 (3d ed. 2007)). By the same token, the Brady disclosure obligation is not (as Judge Chin assumes) a defendant's right at the preliminary evaluation by a prosecutor or in a bail hearing.

In any event, the "claims" Judge Chin purports to uphold are not claims or causes of action; they are theories of damages posited in aid of an impossible cause of

10

Point VII.

## IV

But let us assume that Poventud is not the master of his Complaint, and that he seeks § 1983 damages (as the majority would have it) only for the procedural flaw in his 1998 trial. The <u>Heck</u> bar <u>still</u> forestalls Poventud from going forward.

In urging otherwise, the majority maintains that neither Poventud's extant 2006 conviction nor his vacated 1998 conviction erects a <u>Heck</u> bar to his pursuit of <u>Brady</u> damages. Specifically, the majority concludes that a damages award for a <u>Brady</u> violation in connection with Poventud's 1998 conviction (after trial) would not impugn the integrity of the conviction in 2006 (based on the guilty plea). Further, the majority concludes that the vacatur of the 1998 conviction, even with a remand for retrial, was sufficient to satisfy the favorable termination predicate of <u>Heck</u> notwithstanding our holding in <u>DiBlasio v. City of New York</u>, 102 F.3d 654 (2d Cir. 1996), because Poventud's <u>Brady</u> claim does not sound in malicious

action. Whether a <u>Brady</u> violation occurred is a distinct inquiry from whether a particular harm--such as the denial of bail--flowed from that violation. And, as we demonstrate below, the former, critical inquiry cannot be answered in Poventud's case without impugning his guilty plea.

11

prosecution and is, in any event, more focused on withheld evidence than on actual innocence.

The majority's analysis is premised on a fundamental distortion of Brady. The goal of Brady is to advance the truth at trial and to promote a result consistent with underlying guilt or innocence; the evil of a Brady violation is that it saps confidence in the verdict and impairs the fairness of the trial in terms of its substantive outcome. "Our Court and others have long recognized that Brady violations obscure a trial's truth-seeking function . . . ." United States v. Mahaffy, 693 F.3d 113, 134 (2d Cir. 2012). "The message of Brady and its progeny is that a trial is not a mere 'sporting event'; it is a quest for truth in which the prosecutor, by virtue of his office, must seek truth even as he seeks victory." Monroe v. Blackburn, 476 U.S. 1145, 1148 (1986) (Marshall, J., dissenting from denial of certiorari). Brady was formulated to advance the search for truth, not to provide a guilty defendant with a sporting chance at acquittal; for that reason, the Brady Court expressly refused to raise a "sporting theory of justice" to "the dignity of a constitutional right." 373 U.S. at 90.

Accordingly, there is no Brady deprivation absent a concern that the truth-finding function of the trial has been thwarted. See infra Point V.A. That is why

12

prosecutors have no constitutional obligation to disclose "any information that might affect the jury's verdict"; as the Supreme Court has emphasized, such a "constitutional standard of materiality approaches the 'sporting theory of justice' which the Court expressly rejected in Brady." United States v. Agurs, 427 U.S. 97, 108 (1976); see also Brady, 373 U.S. at 90.

The majority assumes that Brady is a rule of procedure detached from its ultimate goal. That leads the majority to allow § 1983 damages even though the undisclosed evidence is (as we now know) not material to innocence or the seriousness of the crime, and even though the evidence would have been helpful only to strengthen Poventud's perjurious alibi. This error permeates the majority opinion, turning all its meticulous analysis to error and subverting Brady itself.

This is a mistake, and a serious one. The majority reconceives Brady as a device for preserving the defendant's odds of winning an acquittal by any means, and by perjury in particular. The majority's faulty premise thereby corrupts Brady, and diminishes it.

## V

The "truth-finding function" of Brady inheres in the elements of a Brady-based § 1983 action--namely, materiality, causation, and damages. But none of

13

these elements can be proven without impugning Poventud's guilty plea, and that tactic is blocked by Heck. I take up each element in turn.

**A**

As to materiality: the constitutional right defined by Brady and its progeny is the criminal defendant's procedural due process right to the disclosure of "evidence that is material to his guilt or punishment." Cone v. Bell, 556 U.S. 449, 469 (2009) (citing Brady, 373 U.S. at 87). "[E]vidence is 'material' within the meaning of Brady when there is a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different." Id. at 469-70. So, to establish a Brady violation at his civil trial, Poventud must show not only that the impeachment evidence at issue is favorable to him and was undisclosed, but that it is "material either to guilt or to punishment." Brady, 373 U.S. at 87.

This is always a retrospective determination, as nondisclosure is material only when "the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." Kyles v. Whitley, 514 U.S. 419, 435 (1995). Brady's materiality standard thus implements the underlying purpose of Brady itself: to "ensure that a miscarriage of justice

14

does not occur." See United States v. Bagley, 473 U.S. 667, 675 (1985). As the

Supreme Court has emphasized, "[t]he proper standard of [Brady] materiality

must reflect our overriding concern with the justice of the finding of guilt."

Agurs, 427 U.S. at 112 (1976); see also United States v. Coppa, 267 F.3d 132, 139

(2d Cir. 2001) (holding that the "essential purpose" of Brady is to "ensur[e] the

reliability of [a] criminal verdict").

Consistent with Brady's focus on the reliability of criminal judgments, a

prosecutor's failure to turn over exculpatory or impeachment evidence is a Brady

violation rising to the level of constitutional error only when this failure

"undermine[s] confidence in the outcome of the trial." Bagley, 473 U.S. at 682;

see also Kyles, 514 U.S. at 434 (citing Bagley, 473 U.S. at 678) (vacatur required

where verdict is not "worthy of confidence"). The mere failure to disclose

favorable evidence is not enough, because such a rule "would impose an

impossible burden on the prosecutor and would undermine the interest in the

finality of judgments." Bagley, 473 U.S. at 675 n.7. Moreover, if nondisclosure

alone were sufficient, independent of any concern about the reliability of the

ultimate outcome, Brady damages could be recovered even by a defendant who

was acquitted--a proposition that several courts of appeals and district courts in

15

our Circuit have rejected.[4]

Accordingly, as the Supreme Court said in <u>Strickler v. Greene</u>, a <u>Brady</u> claim is not made out by showing "any breach of the broad obligation to disclose disculpatory evidence," because "there is never a real '<u>Brady</u> violation' unless the nondisclosure was so serious that there is a reasonable probability that the suppressed evidence would have produced a different verdict." 527 U.S. 263, 281 (1999). Thus, "[i]f there is no reasonable doubt about guilt whether or not the additional evidence is considered," the Supreme Court said in <u>Agurs</u>, "there is no justification for a new trial." 427 U.S. at 112-13.

The state court vacated Poventud's 1998 conviction on the ground that the

---

4    See <u>Livers v. Schenck</u>, 700 F.3d 340, 359 (8th Cir. 2012) (stating that "there was no <u>Brady</u> violation because [the plaintiffs] were not convicted" where plaintiffs were acquitted); <u>accord</u> <u>Morgan v. Gertz</u>, 166 F.3d 1307, 1310 (10th Cir. 1999); <u>Cannistraci v. Kirsopp</u>, No. 1:10-cv-980, 2012 U.S. Dist. LEXIS 68399, 2012 WL 1801733 (N.D.N.Y. May 16, 2012); <u>Ambrose v. City of New York</u>, 623 F. Supp. 2d 454, 467-71 (S.D.N.Y. 2009); <u>see also</u> <u>Flores v. Satz</u>, 137 F.3d 1275, 1278 (11th Cir. 1998) (per curiam) (no <u>Brady</u> § 1983 claim following prosecution's determination not to prosecute); <u>McCune v. City of Grand Rapids</u>, 842 F.2d 903, 907 (6th Cir. 1988) (no <u>Brady</u> violation where charges were dismissed before trial); <u>Grenier v. Jonas</u>, No. 1:09-CV-121, 2010 U.S. Dist. LEXIS 20658, 2010 WL 883743 (D. Vt. Mar. 5, 2010) (same); <u>cf.</u> <u>Mosley v. City of Chicago</u>, 614 F.3d 391, 397 (7th Cir. 2010) (reviewing other circuits' case law holding that "a trial that results in an acquittal can never lead to a claim for a <u>Brady</u> violation because the trial produced a fair result, even without the exculpatory evidence," but not deciding the issue); <u>Smith v. Almada</u>, 640 F.3d 931, 941-42 (9th Cir. 2011) (Gwin, D.J., specially concurring).

State's failure to disclose Duopo's initial identification of Poventud's brother, Francisco, eroded confidence in the verdict. On the record before the state court, confidence was impaired because the nondisclosure had bearing on the accuracy of the critical identification made by the victim, and (reciprocally) on Poventud's alibi defense. In short, the withheld information was material from that court's perspective in time.

Poventud, however, will be unable to rely on the materiality finding of the state court in this § 1983 suit. There can be no estoppel because none of the defendants (the police officers, the district attorney, and the City) were parties in the criminal appeal, and no defendant here is in privity with any litigant in the criminal appeal. See Brown v. New York, 60 N.Y.2d 897, 898-99, 458 N.E.2d 1250 (1983) (concluding that issue preclusion did not apply against the defendant municipality in a civil action for false arrest and assault based on dismissal of a criminal charge because the district attorney and the municipality do not "stand in sufficient relationship to apply the doctrine"); see also Stancuna v. Sherman, 563 F. Supp. 2d 349, 353-54 (D. Conn. 2008) ("Although the Second Circuit does not appear to have expressly so held, a number of other circuits have held that government employees in their individual capacities are not in privity with their

17

government employer." (collecting cases)).[5]

Poventud, therefore, will be required to prove by a preponderance that the nondisclosure was material, i.e., that it caused a result that is wrong or unworthy of confidence.  But his own guilty plea forecloses that possibility.  It establishes--beyond doubt--that the undisclosed impeachment evidence could only have been used at Poventud's trial to insinuate falsely that Younis Duopo, a truthful witness offering an accurate identification of Poventud as his robber, should not be believed.  In short, the plea establishes that the supposed Brady evidence is wholly immaterial.

The plea gives the necessary assurance categorically, because the nondisclosure that justified vacatur by the state court in 2005 no longer calls into question the correct resolution of the only issue on which this nondisclosure had bearing.  The victim's identification of Poventud was sound.  The failure to

---

[5]    Stancuna interpreted the preclusive effect of an earlier federal judgment. Although New York law determines the preclusive effect of a judgment entered in New York, see Migra v. Warren City Sch. Dist. Bd. of Educ., 465 U.S. 75, 81 (1984), there is "no significant difference between New York's preclusion law and federal preclusion law," Pike v. Freeman, 266 F.3d 78, 90 n.14 (2d Cir. 2001); see also Marvel Characters, Inc. v. Simon, 310 F.3d 280, 286 (2d Cir. 2002) ("The parties agree that there is no discernible difference between federal and New York law concerning res judicata and collateral estoppel.").

provide Poventud with impeachment material with which to challenge that

identification, moreover, is shown to be immaterial by virtue of Poventud's own

solemn admission.  Poventud cannot have it both ways: he cannot state that he is

guilty, that he was present on the day in question and participated in the crime,

but that he was nonetheless prejudiced at his trial by the nondisclosure of

evidence that could have helped him only by suggesting that the accurate

testimony of the victim should not be believed.  This conclusion flows from the

meaning and purpose of <u>Brady</u>.

The majority disregards Poventud's guilty plea and seeks to focus only on

the vacatur of the 1998 judgment.   The Supreme Court, however, has counseled

against such a blinkered approach.  Thus, in <u>Lockhart v. Fretwell</u>, 506 U.S. 364

(1993), a habeas petitioner alleged ineffective assistance because his counsel

failed to interpose an objection based on circuit precedent that was later

overruled.  Notably, the standard for ineffective assistance is the same

retrospective standard that is used to assess <u>Brady</u> materiality: namely, whether

there is a "reasonable probability" that but for the claimed error, the result would

have been different.  <u>Strickland v. Washington</u>, 466 U.S. 668, 694 (1984).  <u>Fretwell</u>,

like <u>Brady</u>, rejects the sporting chance approach to the criminal trial and focuses

19

on the justice of the ultimate result.[6] <u>Fretwell</u> concluded that the outcome of the proceeding was correct despite counsel's failure to object: the petitioner had not been deprived of constitutionally effective assistance, only of "the chance to have the state court make an error in his favor." 506 U.S. at 371 (internal quotation marks omitted). The petitioner could not premise a constitutional claim, the Court concluded, on "a windfall to which the law does not entitle him." <u>Id.</u> at 370. The same retrospective look, under the same standard, yields the same result for Poventud: he would receive an impermissible windfall if afforded damages for the nondisclosure of impeachment material that he could only have used to make accurate testimony appear unreliable.

**B**

As to causation: Poventud must also satisfy the elements of the § 1983 action derived from the common law of torts--specifically, causation. <u>See</u> <u>Smith v. Wade</u>, 461 U.S. 30, 34 (1983). "The Supreme Court has made it crystal clear that principles of causation borrowed from tort law are relevant to civil rights

---

[6] The majority's discussion of <u>Fretwell</u>, tactically consigned to its footnote 16, rejects my characterization of the majority's approach as advancing a "sporting chance" theory. <u>See</u> Maj. Op., <u>ante</u>, at 29-30 n.16. However, the footnote forthrightly lays out the majority's approach in a way that adopts and implements the sporting chance theory and demonstrates how it will operate on remand in this case. <u>See</u> <u>id.</u>

actions brought under section 1983." Warner v. Orange Cnty. Dep't of Prob., 115

F.3d 1068, 1071 (2d Cir. 1996) (alteration and internal quotation marks omitted).

Poventud's claim therefore cannot be salvaged by recasting it (as the majority

does) as one potentially seeking nominal damages for no more than a violation of

procedural due process.  To recover money damages of even one dollar,

Poventud must prove that the undisclosed material was both the factual and the

proximate cause of the harm he has identified: wrongful imprisonment.  And

causation must be shown even on the majority's theory that the harm Poventud

suffered was the mere inconvenience of standing trial.  Poventud cannot sustain

this burden without challenging his guilty plea and the resulting 2006 conviction,

which is barred by Heck.

First, Poventud must show that the constitutional violation that he alleges

was an actual cause of his injury.  In the Brady context, the causation inquiry

"essentially replicates the materiality inquiry with a heightened burden of

proof": that is, "[h]aving already shown a reasonable probability that he would

not have been convicted but for the withholding of evidence, a plaintiff must

then make the same showing by a preponderance of the evidence."  Drumgold v.

Callahan, 707 F.3d 28, 49 (1st Cir. 2013).  Poventud, who cannot establish

21

materiality without impugning his guilty plea, is likewise blocked from proving factual causation.

Second, to prevail on his <u>Brady</u> claim, Poventud must prove that the failure to give him impeachment material was a <u>proximate</u> cause of his harm, whether the harm claimed is prison, separation from family and friends, the inconvenience of sitting through his trial, or some sort of risk premium for the increased chance of conviction or a longer sentence. "[I]n all § 1983 cases, the plaintiff must prove that the defendant's action was a proximate cause of the plaintiff's injury." <u>Gierlinger v. Gleason</u>, 160 F.3d 858, 872 (2d Cir. 1998).

Although proximate cause is generally a question to be determined by the trier of fact, "where the actual cause of the injury is undisputed, . . . proximate cause . . . is a question of law for the court." <u>Caraballo v. United States</u>, 830 F.2d 19, 22 (2d Cir. 1987) (citations omitted). The proximate cause inquiry focuses on "whether a cause is a substantial factor in bringing about the harm, or whether the cause is too remotely or insignificantly related to the harm to be a legal basis for liability." <u>Henrietta D. v. Bloomberg</u>, 331 F.3d 261, 278-79 (2d Cir. 2003) (citations and internal quotation marks omitted).

This proximate cause determination has a moral dimension because

proximate cause recognizes only those causal factors that society is prepared to hold legally responsible for a given consequence. See Anza v. Ideal Steel Supply Corp., 547 U.S. 451, 467 (2006) ("That is, to recover, a plaintiff must show . . . that his injury is sufficiently connected to the tort that 'the moral judgment and practical sense of mankind [will] recognize responsibility in the domain of morals . . . .'") (quoting Sutherland, Law of Damages 18 (1882)); Dobbs et al., The Law of Torts § 185, at 622 (2d ed. 2011) ("[P]roximate cause is not about causation at all but about the significance of the defendant's conduct or the appropriate scope of liability in light of moral and policy judgments about the very particular facts of the case.").

Poventud cannot establish proximate cause in a § 1983 trial without impugning his guilty plea. That is because he must show that the State's failure to provide him with impeachment evidence was a substantial factor in causing him injury, and a factor that renders damages appropriate as a matter of law. But as already established at some length, the undisclosed evidence here could only have been useful to Poventud in one very particular way: to support an inference that Poventud was elsewhere at the time of the crime. Poventud has now solemnly admitted that this inference is wholly false. Moreover, Poventud's

23

theory of proximate causation ignores the obvious point that his alleged injury was caused by his own participation in the crime. To find proximate cause on such facts would read moral judgment out of the proximate cause determination just as a finding of materiality would embrace the "sporting chance" approach to the criminal trial. Brady, 373 U.S. at 90 (refusing to accord a trial strategy of this sort "the dignity of a constitutional right"). Accordingly, Poventud cannot prove proximate cause without impugning his guilty plea and inviting the court to disbelieve it.

## C

As to damages: the majority opinion appears to be the first to hold that money damages may be awarded for an alleged Brady violation occurring at the trial of a criminal defendant who thereafter pleads guilty (or is convicted at retrial) of the same underlying crime (or any lesser included offense).[7] Our Court

---

[7]    One case approaches such a result. In Olsen v. Correiro, 189 F.3d 52 (1st Cir. 1999), the plaintiff's murder conviction was overturned due to the suppression of evidence at his first trial, and he subsequently entered a plea of nolo contendere to manslaughter. Id. at 55. The First Circuit rejected his request for incarceration-based damages, holding that this request was barred either because it went beyond "the limits of § 1983 actions" or because it was prohibited by the doctrine of proximate cause. Id. at 67-68. The Court nevertheless permitted--without much reasoning--the recovery of $6,000, which appears to be composed of an attorney's fee and a small punitive damages award.

has twice considered whether § 1983 damages are available in analogous cases. We affirmed the dismissal of two § 1983 complaints claiming such damages: when a vacated conviction was compromised by a subsisting guilty plea, and when an initial charge was resolved by a plea to a lesser included offense. In both cases, we deemed that result sufficiently evident that we decided the issue by summary order. See McNeill v. People of City & State of N.Y., No. 06-CV-4843, 2006 U.S. Dist. LEXIS 77085, 2006 WL 3050867, (E.D.N.Y. Oct. 24, 2006), summarily aff'd, 242 F. App'x 777, 778-79 (2d Cir. 2007) ("Although Appellant's state court conviction was vacated, his subsequent guilty plea stands as a bar, under Heck, to a § 1983 action."); Papeskov v. Brown, No. 97 Civ. 5351, 1998 WL 299892, at *5 (S.D.N.Y. June 8, 1998) (Sotomayor, J.) ("[A] plea of guilty, even to a charge lesser than that for which the plaintiff was arrested, bars a § 1983 action."), summarily aff'd, 173 F.3d 845 (2d Cir. 1999).

The only district judge in this Circuit to deal with identical facts viewed it as elementary that Heck would bar the entirety of the plaintiff's Brady-based § 1983 claim, however framed: "Even if plaintiff seeks damages solely for any 'extra' time served, it nevertheless imputes an illegitimacy to her plea and sentence. We do not see any basis for, or find any authority supporting, the

25

separation of these two periods of imprisonment for purposes of a § 1983 action."

Stein v. Cnty. of Westchester, 410 F. Supp. 2d 175, 179 (S.D.N.Y. 2006) (Conner, J.). No authority for the majority's position has materialized since Judge Conner decided Stein.

To claim damages based on imprisonment is inherently difficult given Poventud's guilty plea to holding up Mr. Duopo. As a backup theory, the majority opinion recognizes as valid Brady claims that "did not result in concrete injury." Maj. Op., ante, at 32. But Brady is not a pure process claim. If it were, criminal defendants could claim damages based on a monetization of the increased probability of conviction they faced by reason of the suppression of the evidence, regardless of whether the prosecution ended in acquittal or conviction. This, of course, would defy Heck, which was itself a Brady claim, as well as Amaker v. Weiner, 179 F.3d 48, 51 (2d Cir. 1999), which the majority purports to follow. More importantly, this approach is incompatible with the purpose of Brady, which is to ensure confidence in the outcome of criminal proceedings in terms of guilt or innocence. Brady's materiality standard requires a showing of prejudice that inherently looks to whether the defendant was, in fact, concretely

26

injured.[8]

## VI

Heck bars Poventud's claim for the additional reason that there has been no favorable outcome of the 1998 conviction within the meaning of that precedent.

The 1998 judgment was neither reversed nor "expunged." Maj. Op., ante, at 34. Reversal would mandate entry of an opposite judgment that dismisses the indictment, and an expungement would obliterate, wipe out and annihilate the conviction, whereas, in fact, Poventud's 1998 conviction was "vacated" in contemplation of a retrial. That was a contingent rather than a final outcome. Vacatur is not necessarily an "outcome" if an outcome is how a proceeding comes out at the end.

As the majority concedes, vacatur of Poventud's 1998 conviction with remand for retrial is not a final favorable termination as that term was

---

[8]    Thus, we disagree that the majority can successfully salvage Poventud's Complaint by recasting it as one for nominal damages. See Maj. Op., ante, at 31-32. Poventud's Brady "injury" could only be the frustration of his ability to bolster perjurious testimony, and thereby defeat the trial's truth-seeking function--i.e., the "sporting chance" that is not afforded by Brady and its progeny. The line of cases cited in footnote 4, supra, supports this conclusion that nominal damages are not available for Brady violations (at least in this case). See supra at 16 n.4.

27

understood at common law, because at common law a final favorable termination meant "that the proceeding cannot be brought again," and no final favorable termination is obtained when a prosecution is "abandoned pursuant to a compromise with the accused." Maj. Op., ante, at 20; see also id. at 33.

Moreover, the vacatur of the 1998 judgment cannot be deemed a favorable outcome under Heck without uncoupling the vacataur from the guilty plea to which it led. It would follow from that analysis--as Poventud conceded at oral argument and as the majority concedes--that a vacatur is a favorable outcome for Heck purposes even if it is followed by a plea to the very same offenses as the vacated conviction (rather than to a lesser included offense), and even if it is followed by conviction on the very same offenses after a retrial. That is counterintuitive. Mere vacatur can develop into a favorable outcome if the prosecution is abandoned and the charges against the defendant are dismissed. However, vacatur does not yield a favorable outcome when, as here, original charges are compromised pursuant to a plea agreement that results in a conviction for a lesser included crime. In DiBlasio, this Court expressly held that a conviction for a lesser included offense after vacatur does not constitute a favorable termination for purposes of Heck. I think most criminal defendants would agree that a vacatur leading only to retrial or a plea is, generally speaking,

28

an outcome that can be considered a complete victory only for defense counsel.

The majority recites that it complies with the favorable termination rule of DiBlasio, but then tries to narrow the rule to the particular constitutional claim there at issue: malicious prosecution. This narrowing fails because Heck, itself premised on Brady error, drew an analogy to malicious prosecution requirements--an analogy that, as the majority recognizes, was not coincidental but "continues throughout Heck." Maj. Op., ante, at 19. Heck explains that, under common law, "a cause of action for malicious prosecution does not accrue until the criminal proceedings have terminated in the plaintiff's favor," and concluded that "so also a § 1983 cause of action for damages attributable to an unconstitutional conviction or sentence does not accrue until the conviction or sentence has been invalidated." 512 U.S. at 489-90. Those terms--"terminated in plaintiff's favor" and "invalidated"--are synonymous, rather than distinct. See DiBlasio, 102 F.3d at 659 ("If interpreted literally, this sentence would seem to mean that any time a conviction is overturned by a writ of habeas corpus there has been a final determination in favor of the accused. We are not convinced that this is what the [Heck] Court intended."); cf. Heck, 512 U.S. at 493 (Souter, J., concurring) (noting that the Heck majority "transplanted" the common law

29

favorable termination requirement to § 1983 claims that impugn an extant conviction).

To explain away incompatible precedents, a footnote in the majority opinion suggests a division of Brady claims between (1) those involving withheld exculpatory evidence that could have proved innocence and thus "do suggest a malicious prosecution claim[,]" and (2) those that, like Poventud's, are "less concerned with . . . innocence and [that] instead focus[] on 'evidence that an identifying witness was unreliable, and evidence impeaching the credibility of significant prosecution witnesses.'" Maj. Op., ante, at 35 n.20 (quoting Second Am. Compl. ¶ 128). According to the majority, the first subset requires a final favorable termination as understood by the common law and this Court in DiBlasio, and the second does not. Id.

The distinction that the majority draws does not favor its result. The majority thinks that the Complaint does not suggest malicious prosecution; but the Complaint describes a nefarious "police cover-up" leading to a "wrongful attempted murder and robbery conviction." Second Am. Compl. ¶ 1. Thus it is alleged that the police targeted Poventud with no evidence of his guilt (much less probable cause), id. ¶¶ 14-17, 24, 35-46, purposely failed to investigate leads that would have exonerated him, and withheld evidence that would have impeached

the victim's identification.[9]

The majority thinks that the Complaint is "less concerned with innocence" and more concerned with witness impeachment. But the Complaint flatly alleges that the suppressed identification is "evidence of innocence." Second Am. Compl. ¶ 128. And it is alleged to be "evidence of innocence" because, "[a]t the time of the crime, [Poventud] did not physically resemble his brother, nor did [he] resemble [his brother] as he was depicted in the old photograph identified by Duopo." Id. ¶ 25. Thus, although the evidence that was withheld would have been useful to impeach Duopo's credibility, it is, at bottom, evidence that Poventud was not Duopo's assailant. These allegations, which run throughout the Complaint, certainly "sound in" malicious prosecution, though the claim is ultimately brought under Brady.[10]

---

[9] For example, the police "did not investigate [Poventud's] alibi, but simply proceeded with processing [his] arrest." Second Am. Compl. ¶ 41. And when the gun used to shoot Duopo was linked to a later shooting, "[r]ather than take the risk that Duopo would identify Martinez [the suspect in the later shooting] and undercut their case against [Poventud], police did not show Martinez to Duopo in a photo array or a lineup." Id.

[10] The majority fails to suggest how district courts are to parse a complaint allegation-by-allegation to determine which Brady-based § 1983 claims are Heck-barred because they "sound in" malicious prosecution. This doctrine is high-maintenance as well as novel, unnecessary, and erroneous.

31

The majority's distinction between <u>Brady</u>-exculpatory claims and <u>Brady</u>-impeachment claims is, in any event, novel and unworkable. It implies that a defendant may bear a heavier <u>Heck</u> burden in pursuing a <u>Brady</u> claim if the withheld evidence is actually exculpatory than if it is merely impeaching. Even a mediocre lawyer can blend one of these leaky categories into the other. Moreover, what can justify this curious distinction other than the "sporting chance" view of <u>Brady</u> that has been expressly rejected by the Supreme Court?

The proper distinction to be drawn from <u>Heck</u> and its progeny is not between malicious prosecution and <u>Brady</u> claims, much less between <u>Brady</u>-exculpatory and <u>Brady</u>-impeachment claims. Rather, it is between (1) constitutional claims that impugn a conviction (whether because the plaintiff claims he is innocent or because he claims the trial's substantive outcome cannot be trusted) and (2) constitutional claims that do not (of which excessive force claims are the most obvious example). When dealing with the former, as we do here, we should faithfully apply our favorable termination precedent, which avoids the pitfalls, inconsistences, and surprises of the majority's approach.[11]

---

[11]    Judge Lynch's concurrence does little else but impugn the 2006 judgment. (Judge Calabresi and Judge Sack laid siege to it in the majority opinion of the three-judge panel, so that makes three judges to have done so.) To impugn the plea, Judge Lynch attacks the plea-bargaining process (as though pleas are not always the product

32

Precedent compels us to conclude that the Heck bar blocks Poventud's claim. Poventud's criminal proceeding did not terminate until he pled guilty to a lesser included offense. DiBlasio, 102 F.3d at 658. Therefore, Poventud's Brady-based § 1983 claim "does indeed call into question the validity of his conviction." Amaker, 179 F.3d at 51.

**VII**

Because we conclude that Poventud's claim necessarily implies the invalidity of his extant conviction, we reach the issues that launched this rehearing in banc: whether the Heck bar applies only to persons in custody, as the majority of the three-judge panel held; whether there are any exceptions to the Heck bar; and whether any exceptions that may exist would save Poventud's claim. We reject the holding of the majority opinion issued by the three-judge panel, an opinion which has in any event been vacated. Assuming arguendo that there are some exceptions to Heck, we conclude that Poventud's action could not come within them.

---

of pressure), observes the imperfect reliability of eyewitnesses, puts in doubt the ability to know anything about human conduct, see Concurring Op. of Judge Lynch, ante, at 3, 17, and concedes the "legal[] valid[ity]" of the plea only in grudging and perfunctory terms--chiefly in a footnote, id. at 8 n.4.

On the basis of self-described <u>dicta</u> signed by five Supreme Court Justices (three of whom are no longer on the Court), a Circuit split has opened as to whether some exceptions to <u>Heck</u> may be permitted. In a nutshell, these Justices posited that "a former prisoner, no longer 'in custody,' may bring a § 1983 action establishing the unconstitutionality of a conviction or confinement without being bound to satisfy a favorable-termination requirement that it would be <u>impossible as a matter of law</u> for him to satisfy." <u>Spencer v. Kemna</u>, 523 U.S. 1, 21 (1998) (Souter, J., concurring) (emphasis added).

Several Circuits have concluded that the <u>Spencer</u> concurrences cannot override <u>Heck</u>'s binding precedent. <u>See, e.g.</u>, <u>Entzi v. Redmann</u>, 485 F.3d 998, 1003 (8th Cir. 2007); <u>Gilles v. Davis</u>, 427 F.3d 197, 209-10 (3d Cir. 2005); <u>Randell v. Johnson</u>, 227 F.3d 300, 301 (5th Cir. 2000) (per curiam); <u>Figueroa v. Rivera</u>, 147 F.3d 77, 80 (1st Cir. 1998). These courts hold that <u>Heck</u>'s bar is absolute, heeding the Supreme Court's admonition that, even if binding precedent "appears to rest on reasons rejected in some other line of decisions, the Court of Appeals should follow the case which directly controls, leaving to [the Supreme] Court the prerogative of overruling its own decisions." <u>Agostini v. Felton</u>, 521 U.S. 203, 237 (1997) (internal quotation marks omitted).

34

Other Circuits have nevertheless held that Spencer's dicta allows courts to recognize unusual and compelling circumstances in which Heck's holding does not absolutely foreclose a claim.  See, e.g., Burd v. Sessler, 702 F.3d 429, 435-36 (7th Cir. 2012); Cohen v. Longshore, 621 F.3d 1311, 1317 (10th Cir. 2010); Wilson v. Johnson, 535 F.3d 262, 267-68 (4th Cir. 2008); Powers v. Hamilton Cnty. Pub. Defender Comm'n, 501 F.3d 592, 603 (6th Cir. 2007); Guerrero v. Gates, 442 F.3d 697, 704 (9th Cir. 2006); Harden v. Pataki, 320 F.3d 1289, 1298 (11th Cir. 2003).

There is no need to choose a side in this split because the narrow exception articulated by Justice Souter would be inapplicable here in any event.  The motivating concern in the Spencer dicta was that circumstances beyond the control of a criminal defendant might deprive him of the opportunity to challenge a federal constitutional violation in federal court.  Poventud is not such a person.

Poventud challenged his first conviction in state court and won--making it unnecessary for him to seek federal habeas relief.  At that point, Poventud had the option of defending in an untainted trial or of pleading guilty to the same crime on reduced charges and accepting a reduced sentence.  He chose to plead. Poventud then had the option of filing a motion to challenge the voluntariness of

35

his plea--and Poventud did so, but he withdrew it prior to an evidentiary hearing. It was therefore by no means "impossible as a matter of law," Spencer, 523 U.S. at 21 (Souter, J., concurring), for Poventud to challenge his conviction and thereby satisfy Heck's favorable termination requirement; he simply decided not to.

On this one point, the full in banc court seems to be unanimous. The majority disclaims any occasion to "reach the broader issue on which the panel rested its decision[,]" Maj. Op., ante, at 33 n.19, which is that the Heck bar does not survive the release of the plaintiff from custody, see Poventud, 715 F.3d at 60. The majority opinion nevertheless acknowledges that, if Poventud's Brady claim were cast in terms of malicious prosecution, it would be barred by DiBlasio, which is of course a Heck-bar case. That could not happen if (as the majority of the three-judge panel held in this case) the Heck bar operates only so long as a § 1983 plaintiff is in jail, and is removed when he is at liberty (as Poventud is and has been). In acknowledging that their analysis "circumscribe[s] Poventud's Brady-based § 1983 claim" in several ways, the majority acknowledges the bar to a civil claim challenging the subsisting 2006 judgment. Thus, notwithstanding that Poventud is as free as any of us, the majority's footnote 20 reflects the

36

holding that certain of his claims could well be "barred" by Heck.[12]  Maj. Op., ante, at 35 n.20.  Similarly, the majority's footnote 22 is at pains to deny that a § 1983 judgment in favor of Poventud would impugn his 2006 conviction, see id. at 37 n.21--a consideration that would be obviated but for the bar of Heck.  The majority may say and claim passim that it does not decide whether release from custody removes the Heck bar, see also id. at 6 n.1; id. at 12 n.7, but the text and mandate of the majority opinion suggest otherwise.  It is useless to deny gravity while falling.

The majority opinion thus necessarily rejects the idea that, once a criminal defendant is at liberty, Heck no longer bars § 1983 claims challenging subsisting judgments--the Heck analysis that we went in banc to reconsider.

## VIII

The majority erodes Heck and corrupts Brady by adopting a deeply flawed notion of due process--due process as a "sporting chance."  This holding will have consequences, none of them salutary.

The moral force of a guilty plea will no longer "quite validly remove[] the

---

[12]    Insofar as the majority endeavors to limit Heck's bar to malicious prosecution claims, I rely on this opinion's discussion as to why that effort fails as a matter of doctrine and as it relates to Poventud's claims specifically.  See supra at 29-33.

issue of factual guilt from the case," <u>Menna</u>, 423 U.S. at 62 n.2 (emphasis omitted), but will be merely an admission to be evaded in § 1983 lawsuits impugning the results of extant state criminal proceedings. Individuals who have been fairly convicted of serious crimes will seek and receive damages for being deprived of a better opportunity for perjury, while people who are actually innocent and exonerated based on new evidence have no cause of action for damages--not to mention the victims of crime such as Mr. Duopo, shot in the neck while on the job. This case illustrates why the sporting chance theory of criminal justice that was rejected by the <u>Brady</u> Court is beneath the dignity of a constitutional right.

## CONCLUSION

For the foregoing reasons, I would affirm the decision of the district court.

DEBRA ANN LIVINGSTON, *Circuit Judge*, dissenting:

Until today, *Brady v. Maryland*, 373 U.S. 83 (1963), and its progeny represented a safeguard against the miscarriage of justice. In this Circuit – at least until such time as today's error is corrected – *Brady* now includes, with our imprimatur, the right to recompense for a denial of the opportunity to commit perjury more successfully.

I concur fully in Judge Jacobs's powerful dissent, which explains how the majority effectively (but unjustifiably) inters *Heck v. Humphrey*, 512 U.S. 477 (1994), as it relates to convictions obtained after an earlier verdict is set aside for *Brady* error. I write separately to make the point that Poventud's claim, apart from undermining the basic premises of *Heck v. Humphrey*, also simultaneously distorts *Brady v. Maryland* and its progeny beyond recognition. Disregarding the Supreme Court's recognition that *Brady* claims "have ranked within the traditional core of habeas corpus and outside the province of § 1983," *Skinner v. Switzer*, 131 S. Ct. 1289, 1300 (2011), the majority ignores the single fact that Poventud's guilty plea necessarily defeats his *Brady* claim on the merits by rendering implausible any contention that the undisclosed impeachment evidence is material. The undisclosed evidence (as Poventud's guilty plea now establishes) could only have been used at trial to

1

support a perjurious defense. Today's startling conclusion – that in such circumstances, a defendant can nevertheless state a claim for recompense arising from *Brady v. Maryland* – spells serious trouble for future applications of *Brady* in this Circuit.

* * *

The relevant facts are simple, albeit elided in the majority's presentation. First, Poventud's 2006 guilty plea admits Poventud's presence and armed participation in a crime that left Younis Duopo deprived of his money and shot in the neck. Second, this plea, *as the majority acknowledges*, is wholly and diametrically "at odds with [the] alibi" Poventud presented at his 1998 trial, Maj. Op., *ante*, at 29 – a trial in which Poventud took the stand and introduced witnesses falsely to attest that he was elsewhere on the date in question, playing video games. Third, Poventud's § 1983 action, premised on *Brady*, presses but *one* complaint: that Poventud at his 1998 trial was deprived of impeachment evidence he could have used to support his alibi defense by suggesting Duopo was mistaken in identifying him as the robber. Finally, in permitting this § 1983 claim to proceed, the majority concludes that Poventud's guilty plea – notwithstanding that this plea is fundamentally at odds with his alibi defense – poses no obstacle to his *Brady* claim.

2

This is, indeed, a startling result. A "counseled plea of guilty is an admission of factual guilt so reliable," the Supreme Court has said, "that, where voluntary and intelligent, it *quite validly* removes the issue of factual guilt from the case." *Menna v. New York*, 423 U.S. 61, 62 n.2 (1975) (per curiam) (emphasis in original). The Supreme Court's *Brady* jurisprudence makes clear, moreover, that constitutional error for *Brady* purposes *is only present* when, considering the undisclosed evidence in light of the record as a whole, there is reasonable doubt.[1] Thus, the Supreme Court said in *United States v. Agurs*, 427 U.S. 97, 112 (1976), that, "if the omitted evidence creates a reasonable doubt that did not otherwise exist, constitutional error has been committed." But if this is not the case – "[i]f there is not reasonable doubt about guilt whether or not the additional evidence is considered," *id.* at 112-13 – no

---

[1] To be clear, the question in assessing *Brady* materiality is not whether it is more likely than not that a defendant would have been acquitted if the undisclosed evidence had been revealed (or whether, considering this evidence, the proof would have been sufficient). Rather, the question is whether, considering the record as a whole, the undisclosed evidence "could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Strickler v. Greene*, 527 U.S. 263, 290 (1999) (internal quotation marks omitted); *see also Kyles v. Whitley*, 514 U.S. 419, 434 (1995) (citing *United States v. Bagley*, 473 U.S. 667, 678 (1985)) (defining a "reasonable probability" of a different result in terms of "a probability sufficient to undermine confidence in the outcome"). Such is not the case for information that might simply "affect the jury's verdict," without sapping confidence in the result. *United States v. Agurs*, 427 U.S. 97, 108 (1976).

3

constitutional error has occurred. The majority determines, contrary to this authority, that Poventud can make out a *Brady* claim arising from the failure to provide him with impeachment evidence at his 1998 trial even though this undisclosed evidence (as Poventud's guilty plea now establishes) could only have been used to support a perjurious defense. The lack of significant authority in favor of such a surprising result is an indication (and should have been a caution) that something in the majority's analysis is amiss.

That something is a basic fidelity to *Brady*. The majority charges that it is the district court that "misunderstands *Brady*" by "incorrectly presum[ing] that, on the facts of this case, the State could violate Poventud's *Brady* rights only if Poventud is an innocent man." Maj. Op., *ante*, at 29. To be sure, *Brady* can work in favor of the guilty, as well as those wrongly accused, but it is the majority (and not the district court) that misapplies the *Brady* rule. Fashioned as a safeguard against the miscarriage of justice, *see United States v. Bagley*, 473 U.S. 667, 675 (1985), *Brady* imposes a fundamental obligation on the prosecution to disclose evidence for use at trial that is "favorable to [the] accused" and "material either to guilt or to punishment," *Brady*, 373 U.S. at 87. Where nondisclosure of such evidence occurs, regardless whether the undisclosed evidence was intentionally or negligently

4

withheld (or, indeed, withheld in the absence of *any* fault on the part of the prosecution team), there is constitutional error: as the Supreme Court has said, such error occurs "because of the character of the evidence, not the character of the prosecutor." *Agurs*, 427 U.S. at 110. The constitutional concern is thus with a guilty verdict at trial in a circumstance in which the nondisclosure of favorable, material evidence "undermines confidence in the outcome," *Bagley*, 473 U.S. at 678, raising the concern of a possible miscarriage of justice, *see United States v. Coppa*, 267 F.3d 132, 139 (2d Cir. 2001) (noting that the "essential purpose" of *Brady* and its progeny "is to protect a defendant's right to a fair trial by ensuring the reliability of any criminal verdict against him").

The majority thus errs, and badly so, in addressing the question whether Poventud may proceed with his § 1983 *Brady* claim without regard to an essential element that Poventud must prove at his civil trial: namely, the materiality of the undisclosed evidence. For as the Supreme Court has repeatedly said, a *Brady* claim is not made out by showing "any breach of the broad obligation to disclose exculpatory evidence." *See Strickler v. Greene*, 527 U.S. 263, 281 (1999); *see also United States v. Ruiz*, 536 U.S. 622, 628 (2002) (noting that "the Constitution does not require the prosecutor to share all useful information with the defendant"). *Brady* error

5

occurs only when favorable undisclosed evidence is *material* when considered in light of the record as a whole. For "[i]f there is no reasonable doubt about guilt whether or not the additional evidence is considered, there is no justification for a new trial," and *there is no constitutional error*. *Agurs*, 427 U.S. at 112-13; *see also Bagley*, 473 U.S. at 678 (noting that "a constitutional error occurs . . . only if the evidence is material in the sense that its suppression undermines confidence in the outcome of the trial").

At least until now, the character of the *Brady* right, focused as it is on the central question of whether the nondisclosure of favorable, material evidence saps confidence in the ultimate determination of guilt at trial, has placed most *Brady* claims "within the traditional core of habeas corpus and outside the province of § 1983." *Skinner*, 131 S. Ct. at 1300.[2] The majority's analysis, however, suggests that § 1983 will hereinafter be available to *any* defendant whose initial conviction is

---

[2] The majority states, erroneously, that I argue "that *Skinner v. Switzer*, 131 S. Ct. 1289, 1300 (2011), comprises a general prohibition on *Brady*-based § 1983 claims." Maj. Op., *ante*, at 28 n.14. I do not. *Skinner* simply recognizes, accurately, that because *Brady* evidence "is, by definition, always favorable to the defendant and material to his guilt or punishment," and because parties asserting *Brady* violations "generally do seek a judgment qualifying them" for immediate or speedier release, 131 S. Ct. at 1300, *Brady* claims have most often sounded in habeas. My point is merely that the majority's reformulation of the *Brady* right – a reformulation that dispenses with Poventud's obligation to prove materiality at his civil trial – changes this calculus for a not insignificant set of cases.

6

vacated for *Brady* error but who awaits retrial; or pleads guilty after vacatur; or is even convicted of the very same crime *upon* retrial. For in none of these cases, as the majority puts it, would "a favorable judgment in [the] § 1983 action . . . render invalid" any subsequent state court judgment. Maj. Op., *ante*, at 34. And favorable termination, in the majority's view, is a hoary old requirement associated with malicious prosecution and not *Brady* claims, despite the fact that *Heck* itself involved a *Brady* claim. *See Heck*, 512 U.S. at 479 (stating that Heck's *pro se* complaint alleged, *inter alia*, that the defendants had "knowingly destroyed evidence which was exculpatory in nature and could have proved [Heck's] innocence" (internal quotation marks omitted)).

The Supreme Court has held that "impeachment information is special in relation to the *fairness of a trial*," so that "the Constitution does not require the Government to disclose material impeachment evidence prior to entering a plea agreement with a criminal defendant." *Ruiz*, 536 U.S. at 629, 633 (emphasis in original). But the Court has not yet considered a case like this one – where a § 1983 plaintiff seeks *Brady* damages after being convicted at trial, having his conviction vacated for the nondisclosure of impeachment evidence, and then pleading guilty, now solemnly admitting to the very proposition that the undisclosed trial evidence

7

could have been used to impeach. It has long been understood, however, that "the scope of the government's constitutional duty" pursuant to *Brady* – "and, concomitantly, the scope of a defendant's constitutional right – is ultimately defined retrospectively." *Coppa*, 267 F.3d at 140. And this is enough to doom Poventud's § 1983 claim.

Poventud's guilty plea, establishing (as it does) that the undisclosed impeachment evidence about which Poventud complains could only have been used by him at trial to impeach Duopo's *accurate* identification of Poventud as his assailant, forecloses the possibility that Poventud's *Brady* claim can succeed. This is not to excuse the conduct of police in failing to provide Poventud with the information at trial that Duopo, from his hospital bed, first identified Poventud's brother as the assailant, before Poventud was a suspect at all.[3] Poventud's trial conviction was vacated on this ground, and properly so. But Poventud has now solemnly admitted that he committed the crime that on March 6, 1997, at about 8:40 in the evening, left Younis Duopo in the area of Oliver Place and Marion Avenue in

---

[3] As Judge Jacobs's dissent accurately states, Poventud's brother became a suspect when police recovered his photo identification from a wallet found in Duopo's cab. Suspicion focused on Poventud when police learned that his brother was in prison on the day of the crime.

8

the Bronx, bleeding from a gunshot wound. Poventud's guilty plea establishes, as a matter of law, that he was the armed assailant and that Duopo was not mistaken in identifying him – in short, that the undisclosed impeachment evidence is utterly immaterial. Thus, even if Poventud's § 1983 claim were not barred by *Heck* – and it is – it should have been dismissed on the pleadings. For Poventud, having admitted in his guilty plea to the truth of what the undisclosed evidence *could only have helped him falsely deny*, cannot possibly allege the elements of a cognizable *Brady* claim under *any* pleading standard. *See* Fed. R. Civ. P. 12(b)(6); *see also Conley v. Gibson*, 355 U.S. 41, 45-46 (stating that a complaint should be dismissed if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief"), *abrogated by Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) (rejecting *Conley* in favor of the plausibility standard).

The majority avoids this conclusion by reading materiality out of a *Brady* claim – by suggesting, inexplicably, that whenever favorable evidence goes undisclosed, and the defendant is convicted at trial, the State has *ipso facto* failed to prove guilt beyond a reasonable doubt and a *Brady* violation has been established.[4]

_____

[4] The majority also obliquely suggests, without explanation, that materiality might be shown here by virtue of the fact that Poventud pled guilty to a lesser included offense and not to the same charges on which he was convicted at trial. *See* Maj. Op., *ante*, at 30

9

The elements of a *Brady* claim, however, are well settled and require *both* the nondisclosure of favorable evidence and a showing that the undisclosed evidence is *material* – that *the undisclosed evidence* creates a reasonable doubt as to guilt or punishment, considering the record as a whole. *See, e.g., Alexander v. McKinney*, 692 F.3d 553, 556 (7th Cir. 2012) ("In order to bring a *Brady* claim [under § 1983], a plaintiff must demonstrate that: (1) the prosecution suppressed evidence; (2) the evidence was favorable to the accused; and (3) the evidence was material, that is, there was a reasonable probability that prejudice ensued."); *accord Smith v. Almada*, 640 F.3d 931, 939 (9th Cir. 2011); *Ambrose v. City of New York*, 623 F. Supp. 2d 454, 467 (S.D.N.Y. 2009). Poventud, having admitted in his guilty plea that he *was* present and that he participated in the crime, cannot at his § 1983 trial contend that the undisclosed impeachment evidence raises a question as to these very propositions. In short, he cannot establish materiality as a matter of law.

Judge Lynch, in his concurrence, similarly disregards the element of *Brady* materiality, asserting that *Brady* damages should be awarded to Poventud "for the

---

n.17. The majority is correct that the nondisclosure of favorable evidence *material to punishment* constitutes *Brady* error. *See Brady*, 373 U.S. at 87. But here, the undisclosed impeachment evidence is not material to punishment: it goes solely to the question whether Duopo's identification of Poventud as one of the robbers was accurate – in short, to the question whether Poventud committed the crime at all.

fact that Poventud lost the opportunity to be acquitted of a crime that he may very well have committed because the rules were not followed" at the trial that preceded his guilty plea. Concurring Op. of Judge Lynch, *ante*, at 12. Poventud's plea, he argues, should not preclude such damages because "humankind lacks the capacity to obtain absolute knowledge of the truth about past events." *Id.* at 13. The truth, he notes (in an observation perhaps made once or twice before), "is elusive, and can never be known with certainty." *Id.* at 18. Judge Lynch charges that the dissenters, apparently forgetting "the limited scope of human knowledge," "appear to insist that [Poventud's] guilty plea represents not just a legal truth, but an existential one." *Id.* at 13, 18.

With respect, it is the majority that refuses to give Poventud's guilty plea its ordinary, *legal* effect. Perhaps *because* cognizant of the limits of human knowledge, the Supreme Court has cautioned that a guilty plea "is a grave and solemn act to be accepted only with care and discernment." *Brady v. United States*, 397 U.S. 742, 748 (1970). "Central to the plea," the Court has said, "and the foundation for entering judgment against the defendant is the defendant's admission in open court that he committed the [charged] acts . . . . He thus stands as a witness against himself." *Id.*; *see also Tollet v. Henderson*, 411 U.S. 258, 267 (1973) (noting that a criminal defendant

11

who has solemnly admitted his guilt in open court "may not thereafter raise independent claims relating to the deprivation of constitutional rights that occurred prior to the entry of the guilty plea").

Judge Lynch argues that Poventud's guilty plea is no more reliable than his alibi testimony at trial. But he cites no authority (and there is none) for the proposition that judges may pick and choose which guilty pleas should be afforded their ordinary legal effect.[5] As a *legal* matter, moreover (and without any need to claim omniscience), only one of Poventud's conflicting accounts of where he was and what he was doing on the night of March 6, 1997, is part of an outstanding criminal judgment that is binding upon him in other proceedings – including for purposes of collateral estoppel in a civil suit such as this. *See Allen v. McCurry*, 449 U.S. 90, 102-04 (1980) (holding that collateral estoppel precludes a § 1983 plaintiff from relitigating facts established in a prior criminal conviction).

In the circumstances of this case, in which Poventud's guilty plea affirms the truth of what the impeachment evidence could only have helped him deny at trial,

---

[5] Ironically, Judge Lynch's concurrence also makes apparent what the majority refuses to admit in its disavowal of the *Heck v. Humphrey* bar: namely, that Poventud's effort to prove materiality at his § 1983 trial will, of necessity, involve the impugning of his extant conviction.

12

Poventud's plea renders him unable to prove materiality at his § 1983 trial. Because a counseled guilty plea, where voluntary and intelligent, "removes the issue of factual guilt from the case," *Menna*, 423 U.S. at 62 n.2, the omitted evidence no longer creates a reasonable doubt that did not otherwise exist. *See Agurs*, 427 U.S. at 112-13 (noting that omitted evidence "must be evaluated in the context of the entire record" and observing that where such evidence raises no reasonable doubt, constitutional error has not occurred). Poventud cannot establish materiality as a matter of law. And the majority avoids this conclusion only by dispensing with this element of a *Brady* claim.

Judge Lynch argues that "simple justice" requires the "common sense, rough justice" result the majority reaches here. Concurring Op. of Judge Lynch, *ante*, at 9, 11. Poventud obtained his rough justice, however, when the state court, on a record that did not include Poventud's subsequent admission to participation in the crime, properly determined that the nondisclosure of Duopo's initial misidentification of Poventud's brother required vacatur of Poventud's trial conviction and remand for a new trial. Poventud's indeterminate sentence of 10 to 20 years was set aside. Poventud, however, has now solemnly admitted that he was the robber – that Duopo's trial identification was accurate and, in effect, that Poventud's alibi defense

13

was perjurious. It is neither "common sense" nor "justice" to conclude that a counseled defendant who negotiates a guilty plea after the vacatur of a trial conviction for *Brady* error, admitting the truth of what the undisclosed evidence could only have been used at trial to deny, may thereafter impugn that negotiated plea in a § 1983 suit in which he stridently asserts both his innocence and his right to substantial compensation. By refusing to afford Poventud's plea its ordinary *legal* effect, the majority, contrary to *Brady* and its progeny, adopts "a constitutional standard of materiality [that] approaches the 'sporting theory of justice' which the Court expressly rejected in *Brady*." *Agurs*, 427 U.S. at 108.

The majority charges that the dissenters "misunderstand" *Lockhart v. Fretwell*, 506 U.S. 364 (1993). Maj. Op., *ante*, at 29 n.16. In fact, it is the majority that refuses to take the wise counsel of that case, which makes apparent that materiality must be assessed retrospectively – and here, requires taking Poventud's guilty plea into account. *Fretwell* involved an ineffective assistance claim. As Judge Jacobs points out, the prejudice component of such claims, as first articulated in *Strickland v. Washington*, 466 U.S. 668 (1984), requires courts, in determining whether a defense lawyer's conduct has deprived a defendant of his Sixth Amendment rights, to undertake a retrospective inquiry – as with *Brady* – into whether an asserted error

14

has produced an unreliable result at trial. In *Fretwell*, the Supreme Court declined to find constitutional error in trial counsel's failure to raise an objection that, as Justice O'Connor said in her concurrence, "very well may have been sustained had it been raised at trial" but which, by the time the Court took up the question, was "wholly meritless under current governing law." *Fretwell*, 506 U.S. at 374. The Court determined that it was not appropriate to assess the effectiveness of counsel "under the laws existing at the time of trial" because such an approach would "grant the defendant a windfall to which the law does not entitle him" and be inconsistent with the focus of *Strickland*'s prejudice component on the reliability and fairness of the ultimate result. *Id.* at 369-71 (majority opinion).

Similarly here, Poventud's guilty plea, attesting to the accuracy of Duopo's identification of Poventud as his assailant, forecloses Poventud's *Brady*-based § 1983 claim by establishing the immateriality of the undisclosed evidence as a matter of law. Vacatur of Poventud's trial conviction was required because, prior to Poventud's plea, the nondisclosure of the impeachment material created a reasonable doubt as to the accuracy of Duopo's identification. *See Agurs*, 427 U.S. at 112 ("[I]f the omitted evidence creates a reasonable doubt that did not otherwise exist, constitutional error has been committed."). Poventud's subsequent guilty

plea, however, establishes the immateriality of the nondisclosure categorically. And contrary to the majority's position, there is no constitutional error from the nondisclosure of immaterial evidence – evidence that does nothing more than increase a defendant's odds at trial, irrespective of "our overriding concern with the justice of the finding of guilt." *Id.* For, once again, "[t]hat statement of a constitutional standard of materiality approaches the 'sporting theory of justice' which the Court expressly rejected in *Brady*." *Id.* at 108.

* * *

As Judge Jacobs's principal dissent makes clear, this case is easily resolved with a faithful application of *Heck*. For while the majority assures us that *Heck* does not apply because "a favorable judgment in this § 1983 action would not render invalid" Poventud's "plea-based judgment," Maj. Op., *ante*, at 34**,** this is wholly beside the point. *Heck* does not bar § 1983 actions that invalidate state convictions, but those where success in a plaintiff's damages suit would necessarily *impugn* his extant state conviction, *implying* its invalidity. *See Wallace v. Kato*, 549 U.S. 384, 393 (2007) (noting that the *Heck* bar applies where § 1983 claim would necessarily "impugn" an extant conviction). Poventud cannot prove the elements of his § 1983 claim – cannot prove, in Judge Lynch's words, that the failure to provide Poventud

16

with the omitted impeachment material *corrupted* the trial's fact-finding process –

without establishing that the nondisclosed impeachment evidence is *material*. To do

this, Poventud must establish that considering the record as a whole, the omitted

impeachment material creates a reasonable doubt as to whether he was Duopo's

assailant. *See Agurs*, 427 U.S. at 112 (noting that materiality has been established "if

the omitted evidence creates a reasonable doubt that did not otherwise exist,"

considering the record as a whole). In other words, he must draw into question –

impugn – the veracity of his own plea. In such circumstances, the *Heck* bar clearly

applies.

Even if this were not the case, however (and it certainly is), Poventud's *Brady*

claim still fails on the merits. Judge Lynch says that "[n]o one who was not there

will ever know for certain whether Marcos Poventud participated in the robbery of

Younis Duopo." Concurring Op. of Judge Lynch, *ante*, at 12-13. But affording

Poventud's guilty plea its ordinary legal effect requires no such certitude (existential

or otherwise), but only that we take Poventud himself at his solemn word.

Poventud has stated, in entering a guilty plea, that he committed the crime. He

could have continued to deny it and, if successful in his state court proceeding,

thereafter sued for damages pursuant to § 1983. Having chosen to plead guilty,

17

however, Poventud has also pled himself out of his *Brady*-based § 1983 claim by establishing the utter immateriality of the impeachment evidence that was not produced at trial. In holding otherwise – in permitting Poventud to have it both ways – the majority adopts a "sporting chance" approach to *Brady* materiality that the Supreme Court has expressly rejected. *See Brady*, 373 U.S. at 90 (rejecting such an approach as beneath "the dignity of a constitutional right").

As the majority acknowledges, this Court convened *en banc* to decide a different issue from the one it reaches today. With regret, I concur in Judge Jacobs's forecast that the majority's effort here with respect to the issue we *do* decide will prove nearly impossible for district courts faithfully to apply. Our *Heck* jurisprudence will suffer. So will our efforts to identify – and rectify – *Brady* error.

Until today, *Brady* and its progeny represented a safeguard, however imperfect, against the miscarriage of justice. *See Bagley*, 473 U.S. at 675 (noting that *Brady*'s purpose is "to ensure that a miscarriage of justice does not occur"); *accord Agurs*, 427 U.S. at 112 (observing that materiality standard "must reflect our overriding concern with the justice of the finding of guilt"). In this Circuit – at least until such time as today's error is corrected – *Brady* is instead the right to recompense for being denied the opportunity to commit perjury more successfully.

18

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X

MARCOS POVENTUD,                                    :

              Plaintiff,                        :   **<u>SECOND AMENDED COMPLAINT</u>**

              -against-                   :   Index No. 07 Civ. 3998 (DAB)(THK)

CITY OF NEW YORK; DANIEL TOOHEY,                    :
"FRANKIE" ROSADO, CHRISTOPHER DOLAN,
and KENNETH UMLAUFT, Individually and as            :
Members of the New York City Police Department,

                                            :

              Defendants.
-----------------------------------------------------------------X

Plaintiff MARCOS POVENTUD ("Plaintiff"), by his attorneys, ROMANO & KUAN,

PLLC, and the LAW OFFICES OF JOEL B. RUDIN, complaining of the Defendants,

respectfully alleges, upon information and belief, as follows:

<u>**NATURE OF ACTION**</u>

1.      This is a civil action, pursuant to 42 U.S.C. §1983 and *Brady v. Maryland*, 373

U.S. 83 (1963) ("*Brady*"), seeking monetary damages for Plaintiff's wrongful attempted murder

and robbery conviction, and imprisonment for approximately seven years, during which he was

repeatedly assaulted sexually and physically, and traumatized.

2.      The above-named Individual Defendants, all New York City police detectives,

caused Plaintiff's unconstitutional conviction and subsequent imprisonment by deliberately

suppressing exculpatory evidence, known as "*Brady* material," and also lying to and misleading

prosecutors.  The suppressed *Brady* material consisted of an erroneous identification by the

victim of the crime, who was the prosecution's sole identification witness, of a man who was in

*prison* when the crime was committed.  The deliberate police cover-up of such evidence, as well

as the lies police detectives told the prosecutors when denying that any undisclosed identification had occurred, was a substantial and proximate cause of Plaintiff's conviction and his horrible experiences in prison which followed.  The City of New York is liable, pursuant to *Monell v. New York City Department of Social Services*, 436 U.S. 658, 98 S. Ct. 2018 (1978), for the deliberate indifference of policymaking officials at the New York City Police Department ("NYPD") to such constitutional violations, which was a substantial cause of the wrongdoing that occurred.

## STATEMENT OF JURISDICTION

3.    At all times herein mentioned, Plaintiff was a resident of the County of Bronx, City and State of New York.

4.    Defendant CITY OF NEW YORK ("Defendant CITY") is a municipal corporation existing by virtue of the laws of the State of New York.

5.    The NYPD is an agency of the Defendant CITY, and all police officers and detectives referred to herein were at all times relevant to this complaint its employees and agents.

6.    Defendant DANIEL TOOHEY ("Defendant TOOHEY"), Tax I.D. No. 888030, was at all relevant times a detective employed by the NYPD.  He is named here in his official and individual capacities.

7.    Defendant "FRANKIE" ROSADO ("Defendant ROSADO"), Tax I.D. No. 892012, was at all relevant times a detective employed by the New York City Police Department.  He is named here in his official and individual capacities.

2

8.     Defendant CHRISTOPHER DOLAN ("Defendant DOLAN"), Tax I.D. No. 891468, was at all relevant times a detective employed by the New York City Police Department.  He is named here in his official and individual capacities.

9.     Defendant KENNETH UMLAUFT ("Defendant UMLAUFT"), Tax I.D. No. 881484, was at all relevant times a detective employed by the New York City Police Department.  He is named here in his official and individual capacities.

10.    At all times material to this Complaint, the aforementioned individual Defendants acted toward Plaintiff under color of the statutes, ordinances, customs, and usage of the State and City of New York.

## ALLEGATIONS COMMON TO ALL CAUSES OF ACTION

### The Investigation of the Shooting of Younis Duopo

11.    The victim in the underlying criminal case was a livery cab driver named Younis Duopo.  During a robbery attempt, he was shot in the head at approximately 8 p.m. on March 6, 1997, by two passengers who were in the back seat of his cab.  Duopo was hospitalized but survived.

12.    Duopo's livery cab was vouchered by trained NYPD Crime Scene Unit ("CSU") detectives.

13.    It was the job of these detectives to search the taxicab for and to secure all physical evidence possibly related to the crime.

14.    They found 16 fingerprints, but none were Plaintiff's.  They found a hat and a spent shell, but this evidence also was not linked to Plaintiff.

15.    After the CSU finished its work, Defendant ROSADO claimed that he found a blue canvas wallet on the floor of the front passenger seat of Duopo's livery cab.

3

16.     This area had been searched and photographed by the CSU detectives, who did not find any such wallet.

17.     The wallet that Defendant ROSADO claimed to have found contained two old photo identification cards of a man named Francisco Poventud, and nothing else.

18.     Defendant UMLAUFT, a sergeant who was in charge of all the detectives working on the investigation, on the evening of March 10, 1997, showed Francisco Poventud's picture, taken from one of the identification cards, to Duopo.

19.     Duopo identified Francisco Poventud as one of his assailants.

20.     Duopo, in UMLAUFT's presence and at his request, signed a photocopy of Francisco Poventud's identification card.

21.     This was consistent with NYPD procedure, under which a witness is asked to sign his name next to a photograph to indicate a positive identification.

22.     Following this identification, Defendants TOOHEY, ROSADO, DOLAN and UMLAUFT (the "Individual Defendants") learned that Francisco Poventud was incarcerated on the date of the shooting, and therefore could not have been one of the men involved.

23.     The Individual Defendants, contrary to their training and to the official policy of the New York City Police Department, failed to prepare any report that would reveal or draw attention to the erroneous identification.

24.     Having nowhere else to turn to "close" the case, the Individual Detectives decided to investigate Francisco Poventud's family members, including Plaintiff, who is Francisco's brother.

25.     At the time of the crime, Plaintiff did not physically resemble his brother, nor did Plaintiff resemble Francisco as he was depicted in the old photograph identified by Duopo.

4

26. Nevertheless, on March 12, 1997, the Individual Defendants went to the hospital and showed Duopo a photo array that included Plaintiff's photograph, and five "fillers."

27. Duopo did not make any identification.

28. The next day, on March 13, 1997, the Individual Defendants returned to the hospital with the same photo array.

29. Duopo looked at the photos in the array and again did not make an identification.

30. The Individual Defendants indicated in a report that this was a "negative result."

31. The following day, on March 14, 1997, the Individual Defendants again returned to the hospital, this time with a new photo array. It again contained a photograph of Plaintiff, but five different fillers.

32. Thus, Plaintiff was the only individual depicted in more than one photo identification procedure – in fact, his photo was in all three.

33. After the third photo array procedure, Duopo, for the first time, identified Plaintiff as one of the perpetrators.

34. Following this identification, the Individual Defendants, under the direction of UMLAUFT, caused criminal charges to be filed against Plaintiff for the robbery and shooting of Duopo.

35. They also searched Plaintiff's residence, but found no evidence linking him to the crime.

36. The police theory apparently was that Plaintiff had somehow dropped the wallet containing his brother's identification cards onto the floor near the front passenger seat of the victim's taxicab, even though the robbery was committed from the back seat and the perpetrators

had no reason to display the wallet at all, and despite the absence of any evidence that Plaintiff would carry his brother's wallet or identification cards.

37.     Police found no fingerprints or DNA evidence on the wallet or the cards to link Plaintiff to these items.

38.     The police also had no evidence that the wallet had been dropped during the robbery, as opposed to at some other time.

39.     Following his arrest, Plaintiff voluntarily waived his *Miranda* rights and made a videotaped statement to police.

40.     He said, in substance, that he had been playing video games at a neighbor's apartment at the time of the crime, and provided the names of alibi witnesses.

41.     Upon information and belief, the Individual Defendants did not investigate this alibi, but simply proceeded with processing Plaintiff's arrest.

42.     On or about March 23, 1997, 17 days after the Duopo shooting, police apprehended three men for a gunpoint robbery of a livery cab driver committed in a similar manner as the Duopo robbery in the same general vicinity in the Bronx.

43.     Ballistics tests with the gun used in that robbery conclusively established that it was the same weapon that had been used to shoot Duopo.

44.     Jesus Martinez, the gunman in the second robbery, when compared with the appearance of the other two men arrested with him, most closely resembled the description of the shooter provided by Duopo.

45.     Rather than take the risk that Duopo would identify Martinez and undercut their case against Plaintiff, police did not show Martinez to Duopo in a photo array or a lineup.

46.    Instead, on April 2, 1997, police showed Duopo, who knew that an arrest had been made after his photo identification of Plaintiff, a lineup containing Plaintiff. Unsurprisingly, Duopo identified Plaintiff.

47.    The Individual Defendants knew that Duopo's misidentification of Francisco Poventud was highly relevant to the Bronx District Attorney's evaluation of the strength of the evidence against Plaintiff, to the grand jury's decision whether to indict, to the court's decision whether to grant reasonable bail, to the court's decision whether to permit Duopo to make an in-court identification, and to the ultimate decision of the jury at trial whether to convict Plaintiff.

48.    The Individual Defendants knew that they were required by the policies, practices, and procedures of the NYPD, and of the Bronx District Attorney's Office ["BDAO"], to disclose all out-of-court identification procedures to prosecutors handling the criminal prosecution, so that such procedures could be timely disclosed to the defense.

49.    They were required to make such disclosure to the D.A.'s Office at the time of the initiation of the prosecution, at the time of the presentation of evidence to the grand jury, and/or prior to trial.

50.    Nevertheless, the Individual Defendants did not inform the BDAO of the Francisco Poventud misidentification, before, during, or after Plaintiff's trial.  Indeed, when asked by the BDAO to disclose all out-of-court identification procedures utilized during their investigation of this matter, the Individual Defendants essentially lied by disclosing all but the Francisco Poventud identification procedures.

51.    Weeks after Plaintiff's arrest, again utilizing highly suggestive photo and in-person identification procedures, police caused Duopo to identify Robert Maldonado, who had no relationship with Plaintiff, as the second perpetrator.  Maldonado was arrested.

7

52.     As a result of the police cover-up of the Francisco Poventud misidentification, the grand jury was deprived of essential information with which to evaluate Duopo's reliability as an identification witness, and Plaintiff and Maldonado were indicted.

53.     As a further result of the police cover-up of the Francisco Poventud mis-identification, the court was misled concerning the strength of the case against Plaintiff and set prohibitively high bail of $100,000, causing Plaintiff to be incarcerated until trial.

**The Trial Proceedings**

54.     Following Plaintiff's indictment, Plaintiff's counsel made a specific request of the prosecution to disclose whether any witness had "identified anyone other than defendant or codefendant as perpetrators of the crimes charged," and to disclose "all evidence and information . . . which may tend to exculpate defendant either by an indication of his innocence, or by potential impeachment of a witness to be called by the District Attorney within the meaning of *Brady v. Maryland*, 373 U.S. 83 (1963) and *People v. Rosario*, 9 N.Y.2d 286 (1961)."

55.     Under the *Brady* disclosure rule, the prosecution has a continuing obligation to disclose material information favoring the criminal defendant in the possession, custody or control of the District Attorney's Office or the police, especially where the defendant specifically demands such disclosure.

56.     In a specific-demand case, the prosecutor's failure to disclose is likely to mislead the defense into assuming that such evidence does not exist, and thus the prosecution's disclosure obligation is heightened.

57.     In addition, under the related *Rosario* rule, the prosecution has an obligation to

8

disclose to the defense all prior recorded statements of each of its trial witnesses, so that counsel for the accused may determine whether such statements may be used to cast doubt on the witness's testimony.

58.     Duopo's handwritten notation on a copy of Francisco Poventud's photograph mistakenly identifying him was a "statement" that had to be disclosed under *Rosario* as well as under *Brady*.

59.     However, as a result of the police cover-up of the Francisco Poventud mis-identification, the BDAO did not know about, and did not disclose to the defense, Duopo's "statement" misidentifying Francisco Poventud.

60.     This was so even though the Individual Defendants knew the court was holding a pretrial hearing, at which several of them testified, concerning the lawfulness of the identification procedures used with Duopo and whether Duopo's in-court and out-of-court identifications of Plaintiff and Maldonado were sufficiently reliable to be permitted in evidence.

61.     The Individual Defendants knew that Duopo's misidentification of Francisco Poventud would be highly relevant to the court's determination of such hearing.

62.     Indeed, at the hearing, the court expressed concern that the repeated showing of Marcos Poventud's photograph to Duopo during the three photo identification procedures was unfairly suggestive and raised questions about Duopo's ability to make a reliable, in-court identification.

63.     Even though the court then required the prosecution to present Duopo as a witness to establish his independent ability to make a reliable, in-court identification, the police continued to suppress the Francisco Poventud identification evidence, causing the prosecution to fail to disclose it.

9

64.     As a result, the court ruled that Duopo would be allowed to make an in-court identification of Plaintiff.

65.     The prosecutor at the hearing and the trial was Assistant District Attorney ["ADA"] Gregg Turkin.

66.     Prior to and during trial, the Individual Defendants reviewed the evidence, including the police investigation, with ADA Turkin, but still did not reveal to him the Francisco Poventud photo identification procedure and misidentification.

67.     Indeed, they deliberately misled ADA Turkin into believing that, since Francisco Poventud was incarcerated when the crime was committed, they had no reason to, and in fact did not, conduct any identification procedure containing his photograph.

68.     During the trial, the prosecution did not disclose to Plaintiff or to any defense counsel the Francisco Poventud photo identification procedure, Duopo's identification of Francisco's photo, or the existence of anything written by Duopo concerning such an identification procedure.

69.     The evidence "against" Plaintiff at trial was extremely limited: it consisted solely of Duopo's testimony identifying him, as well as the alleged discovery of his brother's wallet and old identification cards in the front passenger area of the livery taxi.

70.     No physical evidence linked Plaintiff to the crime.

71.     There was substantial evidence undermining the reliability of Duopo's identification testimony.  First, the jury learned that Duopo had failed to identify Plaintiff during the first two photo arrays containing his likeness.

72.     Second, right in front of the jury, Duopo misidentified co-defendant Robert Maldonado's brother as one of his assailants.

10

73.     Meanwhile, Duopo's testimony identifying Plaintiff was contradicted by the defense case.  Plaintiff testified in his own behalf that at the time of the crime he was at a neighbor's apartment playing video games and watching movies.

74.     Several defense witnesses also gave testimony supporting this alibi.

75.     In addition, the defense presented evidence that the weapon used to shoot Duopo had been recovered in the possession of three other men, during a similar robbery attempt, just 17 days after the Duopo robbery.

76.     The purported "reliability" of Duopo's identification of Plaintiff, as well as the professionalism of the police investigators who had obtained Duopo's identifications of the defendants, were the key issues addressed by both sides during their closing arguments to the jury.

77.     Even without knowledge of the Francisco Poventud misidentification evidence, or of the Individual Defendants' cover-up of it, the jury initially said it was deadlocked.

78.     On the morning of the third day of deliberations, the jury requested a "read back" of the detectives' and the complainant's testimony regarding the "negative results" from the March 13, 1997, photo array involving Plaintiff's photo.

79.     That evening, the jurors stated they were "hopelessly deadlocked" with regard to both defendants.

80.     Nevertheless, after the court required them to continue deliberating for two more days, the jury returned a verdict of guilty against both defendants.

81.     The prosecution's failure to disclose Duopo's misidentification of Francisco Poventud, as well as the police cover-up and lies concerning this evidence, was a substantial and proximate cause of Plaintiff's conviction.

11

82.	On June 30, 1998, the court sentenced Plaintiff to serve an indeterminate sentence of 10 to 20 years in prison.

83.	At the time of Plaintiff's conviction, he was 26 years old, had never been in prison before, and was of slight build.

84.	The Individual Defendants knew of these characteristics of Plaintiff.

85.	They also knew that individuals with Plaintiff's characteristics were likely to be physically and sexually assaulted in New York City jails and in New York State maximum security prisons.

86.	While Plaintiff appealed his conviction, the Individual Defendants continued to withhold knowledge from the BDAO, and therefore from the defense, of Duopo's mis-identification of Francisco Poventud.

87.	Plaintiff's appeal was denied. *See People v. Poventud*, 300 A.D.2d 223, 752 N.Y.S.2d 654 (1st Dep't 2002), *leave to appeal denied*, 1 N.Y.3d 578, 775 N.Y.S.2d 794 (2003).

### The Discovery of the *Brady* Violation and Vacatur of Plaintiff's Conviction

88.	On April 25, 2002, the New York Court of Appeals reversed co-defendant Robert Maldonado's conviction, and directed that Maldonado be retried. *See People v. Maldonado*, 97 N.Y.2d 522, 743 N.Y.S.2d 389 (2002).

89.	At the retrial held in late 2003, Duopo's ability to make a reliable identification was again the principal issue.

90.	By the time of this retrial, either the NYPD or the BDAO had somehow lost or destroyed the original Francisco Poventud identification cards.

91.	A new prosecutor was assigned to the case, Assistant D.A. Jeremy Shockett.

92.	He offered as a substitute for the original cards a photocopy of one of them.

93. The photocopy contained illegible handwriting, and a date and time – "3/10/97 at 1943 hrs."

94. Contending that the handwriting was irrelevant to the case, Shockett made an application to the court for permission to redact the writing from the photocopy.

95. The defense objected, and the court denied the request.

96. Maldonado's attorney demanded to know the significance of the handwriting.

97. After speaking with UMLAUFT and learning for the first time what the handwriting meant, Shockett then revealed to the defense that the handwriting was Duopo's and concerned a mistaken identification of Francisco Poventud .

98. UMLAUFT, during his testimony, tried to minimize the impact of this evidence by falsely claiming that Duopo, from his hospital bed, had simultaneously written a note stating that the photograph merely "looked like the guy."

99. However, even though UMLAUFT knew that any such note, as a recorded statement by Duopo, absolutely was required to be preserved and to be disclosed to the defense as *Rosario* material, he could not produce it.

100. No one, aside from UMLAUFT, has ever claimed to have seen such a note.

101. This time, the jury acquitted Maldonado.

102. On March 25, 2004, Plaintiff, who was indigent, requested, and the court thereafter agreed, to assign counsel for him to prepare and file a motion, pursuant to N.Y. Criminal Procedure Law § 440.10, to vacate his conviction on the ground that the prosecution had impermissibly failed to disclose to him the Francisco Poventud identification and any writings regarding it (hereinafter referred to as the "*Brady* material") at his trial six years before.

13

103.   On December 6, 2004, Plaintiff's assigned counsel filed a CPL § 440.10 motion to vacate his conviction.   The motion asserted that, at the time of Plaintiff's trial in 1998, Plaintiff and his attorney were not told, and did not know, about the *Brady* material, even though the defense had specifically requested disclosure of just this type of evidence.

104.   Before responding to this motion, ADA Shockett interviewed UMLAUFT.

105.   UMLAUFT lied to Shockett.   UMLAUFT claimed that he had told then ADA Turkin, during Plaintiff's trial in 1998, about the *Brady* material.

106.   UMLAUFT further lied by stating that, at Turkin's direction, he had disclosed the Francisco Poventud identification procedure to defense lawyers during an informal hallway conversation.

107.   As a result of UMLAUFT's lies, Shockett and the BDAO decided to oppose Plaintiff's motion.   They submitted court papers, including UMLAUFT's false affidavit, denying any withholding of evidence under *Brady* and delaying any court decision until after a hearing.

108.   At an evidentiary hearing held on June 15, 2005, UMLAUFT gave false testimony repeating what he had told ADA Shockett. *See* ¶¶ 105-106, *supra*.

109.   The defense lawyers for Plaintiff and co-defendant Robert Maldonado denied under oath that UMLAUFT had made any disclosure to them of the *Brady* material.

110.   The BDAO did not call Turkin to testify at all.

111.   In a decision dated October 6, 2005, the court (Hunter, J.S.C.) credited the defense attorneys over UMLAUFT and held that the prosecutor's failure to turn over information and written documents regarding Duopo's misidentification of Francisco Poventud had violated Plaintiff's constitutional rights under *Brady*.

14

112.   The court vacated Plaintiff's conviction. *See People v. Poventud*, 10 Misc.3d 337, 802 N.Y.S.2d 605 (Sup. Ct. Bronx Co. 2005), annexed hereto as Exhibit A.

113.   At the time of its ruling, Plaintiff had been incarcerated more than seven years following, and as a direct result of, his unconstitutionally-obtained conviction.

## Plaintiff's Injuries and Damages

114.   As a direct, proximate, and reasonably foreseeable consequence of the aforementioned actions by the defendants, plaintiff:

(1)   Was denied his state and federal constitutional rights and liberties;

(2)   Was repeatedly subjected to forcible sexual assaults at knife-point and otherwise, including anal and oral sodomy, and physical beatings;

(3)   Was further traumatized by witnessing sexual and physical assaults on other inmates;

(4)   Was so distraught that he tried to kill himself;

(5)   Suffered severe mental, emotional, and physical distress, including suicidal feelings;

(6)   Suffered permanent mental and emotional harm;

(7)   Was denied the opportunity to pursue normal relationships with and to enjoy the companionship of family members and friends;

(8)   Was publicly shamed, disgraced, ridiculed and humiliated and suffered damage to reputation;

(9)   Suffered lost wages and permanent impairment of earning capacity; and

(10)   Incurred other items of attendant damages.

## FIRST CAUSE OF ACTION

### (42 U.S.C. §1983; Denial Of Due Process And A Fair Trial;<br>All Individual Police Defendants)

115.   Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 114 as if fully set forth herein.

116.   Prior to Plaintiff's conviction in 1998, and continuing thereafter, the Individual Defendants, acting individually and in concert and conspiracy with one another, covered up, lied to prosecutors about, and withheld knowledge from the BDAO and Plaintiff of, the "*Brady* material."

117.   The Individual Defendants knew they had duties, under the United States Constitution as well as the laws and regulations of the State and the City of New York, (a) to disclose the *Brady* material to the BDAO so that the latter could disclose it to the defense and would not be caused to bring about the conviction of Plaintiff based upon false, misleading, or incomplete evidence and argument, (b) under the unique circumstances of this case, to disclose the *Brady* material directly to the defense, and/or (c) to make truthful statements to the prosecution concerning the existence of the *Brady* material and not to cause or continue Plaintiff's unconstitutional conviction and resultant injuries by lying about such evidence.

118.   Notwithstanding their awareness of their duties, the Individual Defendants, prior to, during, and following Plaintiff's trial, intentionally, recklessly, and/or with deliberate indifference to their legal obligations, concealed the *Brady* material from, lied about, and otherwise failed to disclose the *Brady* material to, the BDAO and Plaintiff.

119.   They did so with the knowledge that their conduct would result in the jury being provided a false or misleading picture of Duopo's reliability as an identification witness and of

16

the thoroughness, honesty, and professionalism of the police investigation, and would thereby substantially increase the likelihood of a conviction, in violation of Plaintiff's federal constitutional rights.

120.    After the Francisco Poventud misidentification evidence was revealed at the Maldonado retrial in 2003, Defendant UMLAUFT sought to cover up and perpetuate the defendants' individual and collective wrongdoing, and caused the continuation of Plaintiff's illegal imprisonment and resultant damages, by falsely telling the BDAO, and submitting a false affidavit and giving false testimony, that he had disclosed such *Brady* material to defense counsel at Plaintiff's trial.

121.    The aforesaid conduct operated to deprive Plaintiff of his rights under the Constitution and the Laws of the United States to timely disclosure of all material evidence favorable to the defense pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963), *Giglio v. United States*, 405 U.S. 150 (1972), and their progeny, and to not be convicted or punished based upon the government's knowing use of false or misleading testimony or argument, all in violation of the Due Process and Fair Trial Clauses of the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution.

122.    The foregoing violations of Plaintiff's federal constitutional rights by the Individual Defendants and their co-conspirators and accomplices, known and unknown, directly, substantially, proximately, and foreseeably brought about Plaintiff's conviction, his imprisonment until such time as his conviction was vacated, and his other injuries and damages.

123.    The foregoing violations of Plaintiff's rights amounted to Constitutional torts and were affected by actions taken under color of State law.

17

124.   Defendants committed the foregoing violations of Plaintiff's rights knowingly, intentionally, willfully, recklessly, negligently, and/or with deliberate indifference to Plaintiff's constitutional rights or to the effect of such misconduct upon Plaintiff's constitutional rights.

125.   By reason of the foregoing, all the Individual Defendants are liable to Plaintiff, pursuant to 42 U.S.C. § 1983, for compensatory and for punitive damages.

## SECOND CAUSE OF ACTION

### (*Monell*/42 U.S.C. § 1983:  Claim Against Defendant City of New York For The Actions Of The NYPD)

126.   Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 125 as if fully set forth herein.

127.   Prior to Plaintiff's arrest, policymaking officials at the NYPD, including but not limited to the New York City Police Commissioner, with deliberate indifference to the constitutional rights of individuals suspected of or charged with criminal activity, implemented or tolerated plainly inadequate policies, procedures, regulations, practices, customs, training, supervision, and/or discipline concerning the constitutional duty of police investigators to make timely disclosure to the District Attorney and/or the defense of *Brady* material, to provide truthful information to prosecutors about their knowledge of criminal investigations they have conducted, and to testify truthfully, accurately, and completely during criminal proceedings concerning such investigations.

128.   The above-mentioned *Brady* material included, but was not limited to, evidence of innocence, evidence that an identifying witness was unreliable, and evidence impeaching the credibility of significant prosecution witnesses.

18

129.    The aforesaid policies, procedures, regulations, practices and/or customs (including the failure to properly instruct, train, supervise and/or discipline employees with regard thereto) were implemented or tolerated by policymaking officials for the Defendant City of New York, including but not limited to, the New York City Police Commissioner, who knew:

a)    to a moral certainty that such policies, procedures, regulations, practices and/or customs concern issues that regularly arise in the investigation and prosecution of criminal cases;

b)    either that such issues present police employees with difficult choices of the sort that instruction, training and/or supervision will make less difficult, or that the need for further instruction, training, supervision and/or discipline was demonstrated by a history of police employees mishandling such situations and by the incentives that police employees have to make the wrong choice in such situations; and

c)    that the wrong choice by such employees concerning such issues will frequently cause the deprivation of the constitutional rights of criminal suspects or defendants and cause them constitutional injury.

130.    The aforementioned policymaking officials had notice of the need to properly instruct, train, supervise and/or discipline employees with regard to their aforementioned constitutional obligations based upon, among other circumstances:

a)    numerous credible allegations, many substantiated by judicial decisions, that police officers had wrongfully withheld, lost, or destroyed evidence favorable to the defense that they had been required to timely disclose to the prosecution or the defense under *Brady* and *Rosario* (*see* Ex. B, appended hereto and incorporated herein by reference, listing some of those judicial decisions);

b)    numerous civil lawsuits, some of which resulted in substantial civil settlements, alleging that police had falsified, exaggerated, or withheld evidence, thereby improperly causing unlawful injuries to individuals suspected of crimes (*see* Ex. C, appended hereto and incorporated herein by reference, listing some of those lawsuits);

c)    numerous decisions of the United States Supreme Court, the United States Court of Appeals for the Second Circuit, the New York Court of Appeals, and the New York Appellate Division, discussing the difficult issues that regularly arise under the *Brady* rule;

19

d)      judicial decisions directly criticizing the NYPD for failing to train and supervise officers in their *Brady* obligations and for failing to adopt adequate *Brady* disclosure policies, *see Carter v. Harrison*, 612 F. Supp. 749 (E.D.N.Y. 1985) (McLaughlin, D.J., adopting the Report and Recommendation of then-Magistrate Shira A. Scheindlin), and putting the NYPD on notice that the City could be held liable for its failure to adequately train police officers and investigators regarding their *Brady* and truth-telling obligations, *see Walker v. City of New York*, 974 F.2d 293 (2d Cir. 1992), and *Carter v. Harrison, supra*;

e)      the report dated July 7, 1994, following highly-publicized hearings, of a blue-ribbon New York City investigation into police misconduct known as the "Mollen Commission," and

f)      the inherent obviousness of the need to train, supervise and discipline police officers in such obligations to counteract the pressure on officers to close cases and to obtain convictions and the powerful incentives they have to ignore, discard, fail to record, and fail to disclose evidence favoring a criminal suspect or defendant.

131.    Under the principles of municipal liability for federal civil rights violations, the City's Police Commissioner (or his authorized delegates), had (and has) final responsibility for training, instructing, supervising, and disciplining police personnel with respect to the investigation and prosecution of criminal matters, including constitutional requirements with respect to the disclosure of *Brady* material and the giving of truthful statements and testimony during criminal proceedings.

132.    The Police Commissioner, personally and/or through his authorized delegates, at all relevant times had final authority, and constitutes a City policymaker for whom the City is liable, with respect to compliance by employees of the NYPD with the above-mentioned constitutional requirements.

133.    During all times material to this Complaint, policymaking officials for the NYPD, including, the Police Commissioner, owed a duty to the public at large and to Plaintiff, which they knowingly and intentionally breached, or to which they were deliberately indifferent, to implement policies, procedures, customs, practices, training, and/or discipline sufficient to deter

20

and to prevent conduct by his subordinates which violates the aforementioned constitutional rights of criminal suspects or defendants and of other members of the public.

134.   The aforesaid constitutionally inadequate policies, procedures, regulations, practices, customs, training, and/or discipline of or by Defendant City and the NYPD were collectively and individually a substantial factor in bringing about the aforesaid violations by the Individual Police Defendants of Plaintiff's rights under the Constitution and Laws of the United States.

135.   By virtue of the foregoing, Defendant City of New York is liable for having substantially caused the foregoing violations of Plaintiff's constitutional rights and his constitutional injuries.

## THIRD CAUSE OF ACTION

### (Defendant City of New York for Negligent Hiring, Training, Supervision, And Discipline; Pendent Claim)

136.   Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 135, and hereby incorporates them as though fully set forth herein.

137.   Plaintiff timely filed a Notice of Claim with the Comptroller of the City of New York on March 27, 2006.

138.   Hearings pursuant to New York General Municipal Law § 50-h were waived by Defendant City of New York.

139.   By virtue of the foregoing, Defendant City of New York is liable to Plaintiff for his injuries because its grossly negligent, careless, negligent, reckless and/or deliberate failure to properly hire, train, discipline, and/or supervise its agents, servants and/or employees employed

by the NYPD, including the Individual Defendants, with regard to their aforementioned duties, was a reasonably foreseeable and proximate cause of the injuries suffered by Plaintiff.

## JURY TRIAL DEMAND

WHEREFORE, Plaintiff demands judgment against the Defendants as follows:

a.   For compensatory damages in an amount to be determined;

b.   For punitive damages against the Individual Defendants in an amount to be determined;

c.   For reasonable attorneys' fees, together with costs and disbursements, pursuant to 42 U.S.C. §1988 and to the inherent powers of this Court;

d.   For pre-judgment interest as allowed by law; and

e.   For such other and further relief as this Court may deem just and proper.

ROMANO & KUAN, PLLC

BY: Julia P. Kuan, Esq (JK 3822)
100 Lafayette Street, Suite 401
New York, New York, 10013
(212) 274-0777

LAW OFFICES OF JOEL B. RUDIN

BY: Joel B. Rudin, Esq. (JR 5645)
200 West 57th Street, Suite 900
New York, New York 10019
(212) 752-7600

*ATTORNEYS FOR THE PLAINTIFF*

Dated:   New York, New York
         May 6, 2011

To:   Corporation Counsel of the
      City of New York

22